IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RASHAD B. SWANIGAN, | ) | |
| | ) | Case No. 07 C 4749 |
| Plaintiff, | ) | |
| | ) | Judge Virginia M. Kendall |
| v. | ) | |
| | ) | |
| ROBERT TROTTER, | ) | |
| THOMAS MUEHLFELDER, | ) | |
| MICHAEL F. LYNCH, KEVIN T. MULLANE, | ) | |
| JOSEPH J. POREBSKI, JAMES POREMBA, | ) | |
| ANTHONY R. REYES, | ) | |
| WILLIAM N. WOITOWICH, | ) | |
| MAX J. GUAJARDO, STEVEN KAVANAGH, | ) | |
| PETER W. ORSA, MATTHEW B. ROGUS, | ) | |
| STEVEN F. SWITALLA, | ) | |
| KEITH W. UGINCHUS, | ) | |
| WILLIAM KAUPERT, LUIS MONTALVO, | ) | |
| MICHAEL FRAZIER, THOMAS BEAZLEY, | ) | |
| JANICE DILLON, KEVIN ANDERSON, | ) | |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Rashad Swanigan ("Swanigan") filed this nine-count action against twenty police officers and the City of Chicago, claiming violations of his civil rights following his arrest on August 22, 2006. Swanigan brings five claims under 42 U.S.C. § 1983: false arrest (Count I), unlawful detention (Count II), unlawful search and seizure (Count III), violation of due process (Count IV) and denial of access to counsel (Count V). The remaining four claims arise under Illinois law: intentional infliction of emotional distress (Count VI), malicious prosecution (Counts VII-VIII) and conversion (Count IX). Swanigan and the Individual Officer Defendants have filed cross motions for summary judgment. For the reasons stated, Defendants' Motion for Summary

1

Judgment is granted in part and denied in part and Plaintiff's Partial Motion for Summary Judgment is granted in part and denied in part.

## STATEMENT OF UNDISPUTED FACTS

The Chicago Police Department had assigned Defendant Officers Robert Trotter ("Trotter") and Thomas Muehlfelder ("Muehlfelder") to a bank robbery task force in the 17th District in response to several bank robberies in the area. (Pl. 56.1 Resp. ¶ 4.)[1] On August 22, 2006, before beginning their patrol, Trotter and Muehlfelder participated in the police roll call where other officers distributed a packet of information regarding a suspect wanted in connection with the bank robberies. (Pl. 56.1 Resp. ¶ 5.) The information packet described the suspect, known as the "Hard Hat Bandit," as a 25-30 year old black man with a dark complexion between 5'6" and 5'8" in height, weighing approximately 135-150 pounds, who wore a yellow construction hard hat and sometimes carried a blue steel revolver. (*Id.*; Pl. 56.1 Resp. ¶ 7.; Def. 56.1 Resp. ¶¶ 11-13.) The packet also included surveillance photographs of various other people and a crime analysis report that indicated that all of the related robberies occurred in the late afternoon hours. (Pl. 56.1 Resp. ¶¶ 5, 7.)

At approximately 4:00 p.m. on August 22, 2006, Swanigan, a 30 year old union carpenter, attempted to cash two checks at the Labe Bank located at 4337 N. Elston in Chicago, Illinois, at the intersection of Elston Avenue and Pulaski Road. (Def. 56.1 Resp. ¶¶ 7, 9.) The bank refused to cash one of the checks because it was not drawn on Labe Bank. (Swanigan Dep. at 8:17-19.) Although

---

[1] Citations to Plaintiff's Response, Pursuant to Local Rule 56.1(b)(3)(B), to Defendants' Statement of Material Facts in Support of Defendants' Motion for Summary Judgment have been abbreviated to "Pl. 56.1 Resp. ¶ __." Likewise, citations to Defendants' Reply to Plaintiff's L.R. 56.1(b)(3)(C) Statement of Additional Material Facts In Response to Defendant's Motion for Summary Judgment have been abbreviated to "Def. Add'l 56.1 Resp. ¶ __," citations to Defendant Police Officers' Answer to Plaintiff's Statement of Undisputed Material Facts, Local Rule 56.1 have been abbreviated to "Def. 56.1 Resp. ¶ __" and Plaintiff's Response, Pursuant to Local Rule 56.1(a), to Defendants' Statement of Additional Facts in Opposition to Plaintiff's Motion for Summary Judgment have been abbreviated to "Pl. Add'l 56.1 Resp. ¶ __."

the other check was drawn on Labe Bank, Swanigan chose not to cash that check. (*Id.* at 158:20-159:5.) After Swanigan exited the bank, while driving in their squad car, Trotter and Muehlfelder observed Swanigan standing at the corner of Pulaski and Elston, in front of the bank. (Pl. 56.1 Resp. ¶ 6; Def. 56.1 Resp. ¶ 15.) The officers agreed that Swanigan fit the description of the suspected bank robber. (Pl. 56.1 Resp. ¶ 7.) As they drove, Trotter made eye contact with Swanigan. (Pl. 56.1 Resp. ¶ 8.) Swanigan then quickly turned, dropped his head and walked towards the parking lot. (*Id.*)[2] The officers turned the car around to investigate the situation further and observed Swanigan entering a car from the passenger side. (Pl. 56.1 Resp. ¶ 9; Swanigan Dep. at 131:1-19.)[3] Once the police reached the parking lot, they entered the license plate of Swanigan's car into the Law Enforcement Agency Database System (LEADS) and received a report that the license plates on Swanigan's car were suspended for a mandatory insurance violation. (Pl. 56.1 Resp. ¶ 10.)[4] Through the police dispatch radio system, they confirmed that the license plates had been suspended. (*Id.*) Based on that information, Trotter and Muehlfelder decided to perform a traffic stop. (Pl. 56.1 Resp. ¶ 11.)

---

[2] Swanigan attempts to dispute this fact by claiming that he "merely turned to walk to his car in the parking lot" without quickly turning, dropping his head and walking away. Nothing in the cited portion of Swanigan's deposition contradicts the description of how he acted after making eye contact with Trotter. *See* Swanigan Dep. at 125:22-125:20. Therefore, the Court deems this description admitted. *See* L.R. 56.1(b)(3)(C).

[3] The driver's side door lock in Swanigan's car did not work from the outside because someone damaged it while breaking into his car. To enter his car, Swanigan would enter his car from the passenger side, reach across to unlock the door on the driver's side, walk around the car and enter through the driver's side door. *See* Swanigan Dep. at 131:1-19.)

[4] Swanigan objects to this fact, claiming that the LEADS report is inadmissible hearsay. Hearsay is an out of court statement offered for the truth of the matter asserted. *See* Fed. R. Evid. 801(c). The officers are not offering the LEADS report to prove that Swanigan's license plates were actually suspended at the time of the incident; rather, they are offering it to explain why they decided to conduct the traffic stop. Accordingly, the LEADS report is not hearsay. Additionally, Swanigan claims that the LEADS report only indicates that Swanigan's driver's license was suspended on September 8, 2006, not when the incident occurred on August 22, 2008. While the LEADS report does indicate that Swanigan had a suspended *driver's license* as of September 8, 2006, it also indicates that his *license plates* were suspended for a mandatory insurance violation beginning on May 22, 2006. *See* Def. 56.1 Stmt., Ex. F, at 1.

3

As the officers approached the vehicle in the parking lot, they observed Swanigan lying across the front seat of the car with his feet dangling out of the passenger's side door and his head underneath the steering column as he attempted to "hot wire" the vehicle to get it started. (Def. Add'l 56.1 Resp. ¶ 1; Swanigan Dep. at 130:22-132:10.)[5] Swanigan successfully started the car when the officers approached him and asked for his driver's license and insurance information. (Pl. 56.1 Resp. ¶ 11.)[6] Swanigan provided his driver's license and told the officers that he had insurance but he did not hand them a proof of insurance card. (*Id.*; Def. Add'l 56.1 Resp. ¶ 2.) Despite the information contained in the LEADS report, Swanigan had valid insurance for his vehicle on August 22, 2006. (Def. 56.1 Resp. ¶ 25.) Trotter ordered Swanigan out of the car and placed him in handcuffs. (Pl. 56.1 Resp. ¶ 12.) After Trotter searched him and read him his *Miranda* rights, Muehlfelder escorted Swanigan towards the police car. (*Id.*; Trotter Dep. at 39:1-4.) As they moved towards the police car, Muehlfelder roughly pushed, tugged and shook Swanigan. (Pl. 56.1 Resp. ¶ 12.) When Swanigan complained that his handcuffs were too tight on his wrists, Muehlfelder tightened them further and placed Swanigan inside the police car, driving his elbow into Swanigan's right side, near his ribs. (*Id.*; Def. Add'l 56.1 Resp. ¶ 9.) Sergeant William Kaupert ("Kaupert")

---

[5] Swanigan had to "hot wire" his own car to get it started because of a problem with the car's ignition and steering column. (Swanigan Dep. at 131:21-132:3.)

[6] Although Swanigan claims that he never started the car, the record shows that he did:

Q:      So after you started the car, what happened?
A.      I didn't get a chance to start the car. I started the car–while I was trying to start the car, and I
        started it while they was–when the officers ran up on me, that's when I did it. But I didn't just
        start the car.
Q.      But eventually you did start the car.
A.      Yeah, while they was looking at me, and I did this (indicating) while they were in front of me
        questioning me.

(Swanigan Dep. at 133:18-134:4.)

Similarly, Swanigan attempts to dispute whether the officers asked for his insurance documentation. The portion of the record he cited does not controvert the assertion that the officers asked him for the proof of insurance when they first arrived on the scene; it only supports his claim that the officers did not require him to get the documentation after they removed him from the car, later in the exchange. (Swanigan Dep. at 374:5-23.)

and Officer Luis Montalvo ("Montalvo") arrived on the scene and attempted to interrogate Swanigan. (Pl. 56.1 Resp. ¶ 15.) When Swanigan refused to talk to Kaupert, Montalvo pulled Swanigan out of the police car, pushed him once and demanded that he talk to the officers. (*Id.*; Def. Add'l 56.1 Resp. ¶ 10.) After Swanigan refused, Montalvo put him back into the police car. (Pl. 56.1 Resp. ¶ 15.)

Trotter and Muehlfelder then conducted a search of Swanigan's vehicle although Swanigan repeatedly informed them that he did not consent to the search. (Pl. 56.1 Resp. ¶ 14; Def. Add'l 56.1 Resp. ¶ 8.) During the search, they found a steak knife with a fixed blade longer than two and a half inches on the passenger seat and several hard hats in the back seat, including a yellow one. (Pl. 56.1 Resp. ¶¶ 13-14; Def. Add'l Resp. ¶ 5; Def. 56.1 Resp. ¶ 21.) Trotter, Muehlfelder, Kaupert and Montalvo huddled together to discuss how to handle the situation. (Pl. 56.1 Resp. ¶ 17.) After finding the construction hats in the car and comparing Swanigan with the description of the Hard Hat Bandit, the officers believed that Swanigan could be the Hard Hat Bandit. (Pl. 56.1 Resp. ¶ 16; Def. 56.1 Resp. ¶ 17.) Kaupert approved arresting Swanigan for traffic violations and told Trotter and Muehlfelder to contact the detectives investigating the bank robberies. (Def. 56.1 Resp. ¶ 20.) Trotter and Muehlfelder had Swanigan's car towed and drove him to the 17th District Police Station for processing at approximately 4:20 p.m. (Pl. 56.1 Resp. ¶ 19; Pl. Add'l 56.1 Resp. ¶ 14.) They notified the FBI and the Chicago Police Department's Detective Division that they had Swanigan in custody and that they believed he could be the Hard Hat Bandit. (Pl. 56.1 Resp. ¶ 19.) Detectives Kevin Mullane ("Mullane") and Michael Lynch ("Lynch") began investigating Swanigan's involvement in the bank robberies. (Pl. 56.1 Resp. ¶ 25.) The detectives did not conduct an investigation into the traffic or weapon charges. (Def. 56.1 Resp. ¶ 44.)

When they arrived at the police station, Trotter left Swanigan handcuffed in a holding cell while he and Muehlfelder prepared the arrest and inventory paperwork. (Pl. 56.1 Resp. ¶ 20.) The handcuffs caused welt marks on Swanigan's wrist and caused the fingers on one of his hands to go numb but he did not complain about the tightness of the handcuffs. (Def. Add'l 56.1 Resp. ¶ 19; Swanigan Dep. at 204:13-19, 205:1-4.) Trotter prepared an arrest report to indicate that he had cited Swanigan for the following offenses: 1) unlawful use of a weapon in violation of § 8-24-020 of Chicago's Municipal Code; 2) operating a vehicle with suspended registration in violation of 625 ILCS 5/3-702; and 3) operating a vehicle without insurance in violation of 625 ILCS 5/3-707. (Pl. 56.1 Resp. ¶ 20; Def. Ex. V.) While Swanigan remained in the holding cell, Mullane and Lynch discussed the evidence with Trotter and Muehlfelder. (Pl. 56.1 Resp. ¶ 26.) After Swanigan had been in the holding cell for about twenty or thirty minutes, two unidentified officers ignored his requests to use the restroom and Swanigan urinated on the floor. (Pl. 56.1 Resp. ¶ 21; Def. Add'l 56.1 Resp. ¶ 16.) When Trotter returned to Swanigan's holding cell and noticed the urine on the floor, Trotter told him that he should remain in the cell "and sit in this piss." (Def. Add'l 56.1 Resp. ¶ 17.)

At 6:57 p.m., Acting Watch Commander Lieutenant Joseph Porebski ("Porebski") approved the arrest reports that Trotter and Muehlfelder prepared. (Def. 56.1 Resp. ¶ 28.) In reviewing the arrest reports, Porebski examined them for completeness and to determine if the report's narrative supported a finding of probable cause. (*Id.*) At 7:17 p.m., Trotter and Muehlfelder transferred Swanigan to the lockup and told Porebski that Swanigan had been charged with traffic offenses and the unlawful use of a weapon. (Pl. 56.1 Resp. ¶ 23.) They also told Porebski that they suspected Swanigan was involved with several bank robberies because he matched the general description of the Hard Hat Bandit and because they found him near a bank with construction hard hats in his car.

6

(Pl. 56.1 Resp. ¶¶ 23-24.) Trotter and Muehlfelder had no further contact with Swanigan after they took him to the lockup. (Pl. 56.1 Resp. ¶ 22; Def. 56.1 Resp. ¶ 36.) Once Swanigan arrived at the lockup, unidentified officers searched and fingerprinted him. (Def. 56.1 Resp. ¶ 34.)

After escorting Swanigan to the lockup, Trotter and Muehlfelder discussed the evidence with Mullane and Lynch and showed them the hard hats found in Swanigan's car. (Pl. 56.1 Resp. ¶ 26.) Based upon their investigation, Mullane and Lynch determined that Swanigan also could have been involved in the August 17, 2006 "Popeye's Chicken Robbery," a different robbery linked with the Hard Hat Bandit. (Pl. 56.1 Resp. ¶¶ 25, 38.) They notified their supervisor, Sergeant Max Guajardo ("Guajardo"), that they recommended placing a "hold" on Swanigan to allow sufficient time to round up witnesses and create a lineup for the investigation of the Popeye's Chicken Robbery. (Pl. 56.1 Resp. ¶ 25; Def. Add'l 56.1 Resp. ¶ 14; Def. 56.1 Resp. ¶¶ 39-40.) The hold request was not directed at the traffic or weapon charges. (Def. 56.1 Resp. ¶ 45.) When officers place a hold on a suspect, the suspect will not be released from custody or go to court until the hold is lifted. (Def. 56.1 Resp. ¶ 39.) After the watch commander places a hold on a suspect, only the officer that initiated the hold request can terminate the hold. (Def. 56.1 Resp. ¶ 53.) Guajardo agreed with the request and asked Porebski to place a hold on Swanigan, which he did at 7:36 p.m. (Pl. 56.1 Resp. ¶¶ 25, 27; Def. 56.1 Resp. ¶ 41.) Without the hold, the police could have released Swanigan on bail on August 22, 2006. (Def. 56.1 Resp. ¶ 46.) As a result of the hold, Swanigan could not post bond before August 24, 2006. (Def. 56.1 Resp. ¶ 55.)

After Swanigan answered screening questions, took booking photographs and allowed officers to fingerprint him, he made phone calls to his grandmother and father[7] at 9:00 p.m. (Pl. 56.1

---

[7] Coincidentally, Swanigan's father is a retired Chicago Police Officer who worked the lockup in a different district. (Pl. 56.1 Resp. ¶ 30.)

Resp. ¶ 30.) Swanigan's father told him that he would visit the 17th District Police Station the next day. (*Id.*) After the phone calls, officers offered Swanigan some pizza to eat. (Pl. 56.1 Resp. ¶ 31.) Although he only ate the crust because he thought the pizza did not look appetizing, Swanigan did not ask for anything else to eat. (*Id.*) An unidentified officer took Swanigan's shirt away from him but when he became cold in the lockup that night, a different unknown officer gave him a paper suit to wear. (*Id.*; Def. Add'l 56.1 Resp. ¶ 20.) At 12:05 a.m. on August 23, 2006, Swanigan's fingerprints cleared the system, indicating that he did not have any outstanding arrest warrants. (Def. 56.1 Resp. ¶ 50.) Although his fingerprints cleared, Swanigan remained in custody because of the hold placed on him. (Def. 56.1 Resp. ¶ 49.)

At 9:54 a.m. on August 23, 2006, the police transported Swanigan from the 17th District Police Station to the Area 5 Detective Division. (Pl. 56.1 Resp. ¶ 32.) Officer Peter Orsa ("Orsa") worked at the 17th District's intake desk that day and entered Swanigan's transfer information into the computer system. (*Id.*) Orsa never had direct contact with Swanigan. (*Id.*) When Swanigan arrived at the Area 5 Detective Division, officers placed him uncuffed in a room. (Pl. 56.1 Resp. ¶ 33.) While waiting thirty to forty five minutes for a detective to meet with him, Swanigan knocked on the door and twice asked an unidentified officer to use a restroom but the officer told him to wait each time. (*Id.*) Swanigan urinated on the floor while he waited in the room. (*Id.*; Def. Add'l 56.1 Resp. ¶ 16.) Detective Anthony Reyes ("Reyes") came into the room and stepped in the urine on the floor. (Def. Add'l 56.1 Resp. ¶ 18.) In response, Reyes cursed at Swanigan. ( Pl. 56.1 Resp. ¶¶ 33, 34.) Reyes then placed him in leg shackles and took him to a different room where the police could set up a lineup. (*Id.*) Inside that room, an unidentified officer escorted people to the restroom and mentioned to Swanigan that he had given bologna sandwiches, chips and soft drinks to the others in the room. (Pl. 56.1 Resp. ¶ 35.) Because he is a vegetarian, Swanigan asked for granola

bars, fruits or vegetables. (*Id.*; Def. Add'l 56.1 Resp. ¶ 21.) The officer told him that the police department did not have those types of food available. (Pl. 56.1 Resp. ¶ 35; Def. Add'l 56.1 Resp. ¶ 21.) The officer offered Swanigan "flamin' hot" chips but Swanigan declined them. (Pl. 56.1 Resp. ¶ 35; Def. Add'l 56.1 Resp. ¶ 21.)

After Swanigan arrived in the room, the police conducted several lineups. (Pl. 56.1 Resp. ¶ 36.) Several witnesses identified Swanigan as the offender in the Popeye's Chicken Robbery. (*Id.*) At the same time, Detective Michael Frazier, assigned to the FBI Violent Crime Task Force, conducted lineups in conjunction with an investigation into the Hard Hat Bandit bank robberies. (Pl. 56.1 Resp. ¶ 37; Def. Add'l 56.1 Resp. ¶ 15; Pl. Add'l 56.1 Resp. ¶¶ 17-18.) The Task Force's investigation into the bank robberies was completely independent from the Chicago Police Department's investigation into the Popeye's Chicken Robbery. (Pl. 56.1 Resp. ¶ 37.) Although Frazier believed that Swanigan was a "pretty close" match to the surveillance photographs he had seen of the Hard Hat Bandit, neither of the two eyewitnesses to the bank robberies identified Swanigan as the Hard Hat Bandit. (Pl. 56.1 Resp. ¶¶ 38-39.) At 2:45 p.m., Sergeant Thomas Beazley ("Beazley") approved the General Offense Case Report for Swanigan. (Pl. 56.1 Resp. ¶ 54.) Beazley's approval only meant that the report had been completed properly according to the police department's internal guidelines; it did not mean that he approved of Swanigan's arrest or detention. (*Id.*)

Following the lineup, Frazier and Mullane took Swanigan's fingerprints. (Pl. 56.1 Resp. ¶ 40.) During that time Mullane made general conversation with Swanigan. (*Id.*) Later, when Mullane tried to ask Swanigan questions about the charges, Swanigan refused. (*Id.*) Frazier did not attempt to interrogate Swanigan that day. (Pl. 56.1 Resp. ¶ 42.) That evening, the police permitted Swanigan to see his father, who brought apples, bananas and grapes for Swanigan to eat. (Pl. 56.1

Resp. ¶ 43.)  Additionally, Frazier gave Swanigan a salad to eat.  (*Id.*)  At 1:46 a.m. on August 24, 2006, Officer Matthew Rogus ("Rogus") transported Swanigan back to the 17th District station, where Officer Steven Switalla ("Switalla") was on duty as the Lockup Keeper until Officer Keith Urginchus ("Urginchus") relieved him at 5:30 a.m.  (Pl. 56.1 Resp. ¶¶ 44-45.)  Urginchus had turkey bologna and white bread available in the lockup to feed to the detainees.  (Pl. 56.1 Resp. ¶ 45.)

Swanigan remained at the 17th District Station until Officer Steven Kavanaugh ("Kavanaugh") took him back to the Area 5 Detective Division at 12:38 p.m. on August 24, 2006.  (Pl. 56.1 Resp. ¶ 46.)  The fifteen minute ride to Area 5 was the only contact between Swanigan and Kavanaugh.  (*Id.*)  At 1:00 p.m., Swanigan's attorney arrived at Area 5 and met with his client for about thirty minutes after a brief conversation with Mullane.  (Pl. 56.1 Resp. ¶¶ 47-48.)  Although he participated in more lineups that day, he did not discuss the charges against him based upon his lawyer's advice.  (Pl. 56.1 Resp. ¶ 49.)

At 4:30 p.m. on August 24, 2006, the police requested that an Assistant States Attorney from the Felony Review group conduct a review of the case.  (Pl. 56.1 Resp. ¶ 50; Def. 56.1 Resp. ¶ 56.)  In response, Assistant States Attorney Emily Stevens ("Stevens") interviewed all of the witnesses to the Popeye's Chicken Robbery.  (Pl. 56.1 Resp. ¶ 50.)  During the interviews, one of the witnesses that had identified Swanigan as the perpetrator stated that he or she had incorrectly identified Swanigan in the lineup the previous day.  (*Id.*)  Stevens declined to charge Swanigan with the Popeye's Chicken Robbery because the police did not recover proceeds or a weapon from the crime, Swanigan did not give an incriminating statement, two witnesses had misidentified him during the lineups and Swanigan's carpentry work provided a reason for him to have multiple hard hats in his car.  (*Id.*; Def. 56.1 Resp. ¶ 57.)  She ended her review of the case at 6:43 p.m. on August 24, 2006.  (Def. 56.1 Resp. ¶ 58.)  Once Stevens concluded her review, Lynch released the hold on Swanigan.

(Pl. 56.1 Resp. ¶ 59.) At 7:30 p.m., Lieutenant William Woitowich ("Woitowich") released Swanigan from custody after Swanigan posted his driver's license as bail for the traffic charges. (Pl. 56.1 Resp. ¶ 51; Def. 56.1 Resp. ¶ 60.) In total, Swanigan spent 51.5 hours in custody, 43.5 of which occurred after his fingerprints had cleared. (Def. 56.1 Resp. ¶ 61.) During the detention, Swanigan did not receive a judicial determination of probable cause for his arrest. (Def. 56.1 Resp. ¶ 66.)

On September 1, 2006, the City of Chicago's Department of Administrative Hearings sent Swanigan a notice of hearing for the municipal code violation indicating that Swanigan had been charged with having an "unlawful firearm or laser sight accessory in [his] motor vehicle" in violation of § 8-20-015 of the Municipal Code of Chicago. (Pl. 56.1 Resp. ¶ 20; Pl. Ex. I.) The notice made no reference to a charge for unlawful use of a weapon under § 8-24-020 of the Municipal Code of Chicago and nothing in the record explains why the paperwork indicated a pending firearms charge against Swanigan. (Pl. Ex. I.) A court dismissed the traffic charges against Swanigan on September 25, 2006. (Pl. 56.1 Resp. ¶ 52; Def. 56.1 Resp. ¶ 67.) On September 26, 2006, the City non-suited the municipal violation charge for "unlawful firearm or laser sight accessory in motor vehicle" under § 8-20-015 of the Municipal Code of Chicago after Trotter informed the prosecution that Swanigan did not posses a firearm or laser sight accessory on August 22, 2006. (Pl. 56.1 Resp. ¶ 52; Def. 56.1 Resp. ¶ 68.) Approximately two weeks later, Sergeant James Poremba ("Poremba") reviewed and approved the Detective Division's reports regarding Swanigan by marking the file "Cleared - closed other exceptional." (Pl. 56.1 Resp. ¶ 53; Def. Add'l Resp. ¶ 22.) That designation and the accompanying narrative indicated that the police closed their

investigation because the prosecutor refused to approve charges. (Poremba Dep., at 16:9-15.)[8]  In

October 2006, the police captured Brian Price, who pled guilty to the Hard Hat Bandit bank

robberies.  (Def. 56.1 Resp. ¶ 72.)

On August 22, 2007, Swanigan initiated this action.  In his Third Amended Complaint, he

brought claims against all defendants for all counts.  Swanigan brought federal causes of action

under 42 U.S.C. § 1983 against all Individual Officer Defendants for false arrest (Count I), unlawful

detention (Count II), unreasonable search and seizure of his vehicle (Count III), due process

violations (Count IV), and denial of access to counsel (Count V).  Additionally, he brought state law

causes of action against all of the Individual Officer Defendants and the City of Chicago for

intentional infliction of emotional distress (Count VI), malicious prosecution with respect to the

traffic tickets (Count VII), malicious prosecution for the unlawful use of a weapon charge (Count

VIII) and conversion (Count IX).  Defendants have moved for summary judgment on all counts.[9]

Swanigan moved for partial summary judgment, claiming that he is entitled to judgment as a matter

of law against several officers in Counts I and II.  Specifically, he claims that he is entitled to

summary judgment for false arrest against Trotter, Muehlfelder, Kaupert and Porebski and for

unlawful detention against Trotter, Muehlfelder, Kaupert, Lynch, Mullane, Porebski, Guajardo,

Woitowich, Anderson and Dillon.

---

[8]  Swanigan asserts that the designation "cleared" means "that the case had been solved with [Swanigan] identified in official police department records as the offender, in spite of the fact that charges were never approved against [him]."  Pl. 56.1 Resp. ¶ 53.  The cited portion of Poremba's deposition does not establish that marking a case file as "cleared" means that the police had solved that case.  Rather, Poremba approved a report that indicated that the Popeye's Chicken Robbery was not solved and that the prosecution did not approve charges after eyewitnesses identified Swanigan as the offender during the lineups.  (Poremba Dep., at 16:9-15, 17:10-20, 19:16-21.)

[9]  Defendants admit that factual issues precluded "the watch commander defendants and investigating detectives" from moving for summary judgment on Count II for unlawful detention.  Therefore, all defendants except for Porebski, Janice Dillon ("Dillon"), Woitowich, Kevin Anderson ("Anderson"), Mullane, Lynch and Guajardo moved for summary judgment on Count II.

**STANDARD OF REVIEW**

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment. An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("'Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.'").

**DISCUSSION**

I.      Voluntary Dismissal of Claims

As a preliminary matter, in his Brief in Opposition to Defendants' Motion for Summary Judgment, Swanigan voluntarily consented to the dismissal of all claims against the following defendants: Kavanaugh, Peter Orsa ("Orsa"), Matthew Rogus ("Rogus"), Steven Switalla

("Switalla"), Keith Uginchus ("Uginchus") and Beazley. Those defendants all request that the Court dismiss them from the action with prejudice.

After a defendant has served either an answer or a motion for summary judgment, "an action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper." Fed. R. Civ. P. 42(a)(2). District courts have discretion to impose terms and conditions as a quid pro quo of permitting the plaintiff to voluntarily dismiss the suit in order to protect the other parties from prejudice. *See Ratkovich v. Kline*, 951 F.2d 155, 157-58 (7th Cir. 1991). When a plaintiff moves to voluntarily dismiss defendants after the defendants have served an answer or a motion for summary judgment, a court may dismiss the case with prejudice after taking the following factors into account: 1) the defendant's effort and expense of preparation for trial; 2) excessive delay and lack of diligence on the part of the plaintiff in prosecuting the action; 3) insufficient explanation for the need to take a dismissal; and 4) whether the defendant has filed a motion for summary judgment. *See Pace v. S. Express Co.*, 409 F.2d 331, 334 (7th Cir. 1969).

Here, Swanigan consented to the dismissal of certain defendants only after the parties put much expense and effort into the litigation. The parties engaged in an extensive discovery period that included at least sixteen depositions. Swanigan's consent to dismissal did not include any explanation of his need to voluntarily dismiss those defendants and Swanigan did not consent to their dismissal until after all defendants had moved for summary judgment. Therefore, under Fed. R. Civ. P. 42(a)(2), the Court finds it appropriate to dismiss Swanigan's claims against Kavanaugh, Orsa, Rogus, Switalla, Uginchus and Beazley with prejudice.

II.     Defendants' Motion for Summary Judgment

        A.      Section 1983 Claims

Actions under 42 U.S.C. § 1983 provide redress for constitutional violations committed under color of state law. *See* 42 U.S.C. § 1983. To recover under § 1983, plaintiffs must show that: 1) they were deprived of a right secured by the Constitution or laws of the United States, and 2) the deprivation was visited upon them by a person or persons acting under color of state law. *McKinney v. Duplain*, 463 F.3d 679, 683 (7th Cir. 2006). Section 1983 claims against individuals require personal involvement in the constitutional deprivation. *See Palmer v. Marion County*, 327 F.3d 588, 594 (7th Cir. 2003); *Kelly v. Mun. Courts of Marion County*, 97 F.3d 902, 909 (7th Cir. 1996) ("Individual liability under 42 U.S.C. § 1983 can only be based on a finding that the defendant caused the deprivation at issue."). Even if a plaintiff states a valid claim under § 1983, an individual acting under color of state law may assert qualified immunity. "The doctrine of qualified immunity shields government officials against suits arising out of their exercise of discretionary functions as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Id.* at 683-84. Therefore, a two-part test for § 1983 claims and qualified immunity exists: a court must determine whether the defendant's conduct violated one of the plaintiff's constitutional rights and whether the defendant's conduct violated clearly established rights of which a reasonable person would have known. *See id.* at 684 (citations omitted). The Court may address either part of the test before addressing the other. *See Pearson v. Callahan*, — U.S. —, 129 S.Ct. 808, 818 (2009).

I.      False Arrest

Swanigan first claims that all of the individual officers falsely arrested him on August 22, 2006. A warrantless arrest is valid under the Fourth Amendment if probable cause to make an arrest for any crime existed at the time of the arrest. *See Beck v. Ohio*, 379 U.S. 89, 90 (1964); *Holmes v. Vill. of Hoffman Estates*, 511 F.3d 673, 682 (7th Cir. 2007) ("[P]robable cause to believe that a

person has committed *any* crime will preclude a false arrest claim, even if the person was arrested on additional or different charges for which there was no probable cause . . . .") (emphasis in original) (citing *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)). Police officers have probable cause to arrest if the facts and circumstances within the officer's knowledge at the time of the arrest are sufficient to cause a reasonable person to believe that the suspect has committed, is committing, or is about to commit an offense. *See Chelios v. Heavener*, 520 F.3d 678, 686 (7th Cir. 2004). The existence of probable cause bars the plaintiff's recovery on a false arrest claim under § 1983. *See Chelios*, 520 F.3d at 685. Although probable cause requires more than a bare suspicion of criminal activity, it does not require evidence sufficient to support a conviction. *See Holmes*, 511 F.3d at 679 (7th Cir. 2007).

Because of the objective nature of the probable cause inquiry, courts look to the conclusions that the arresting officer reasonably might have drawn from the information known to him rather than his subjective reasons for making the arrest. *See Devenpeck*, 543 U.S. at 153 (2004) ("The Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in certain circumstances, *whatever* the subjective intent.") (emphasis in original); *Holmes*, 511 F.3d at 679. When an officer has probable cause to believe that an individual has committed even a very minor offense, he may arrest the offender. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001); *see also Williams v. Rodriguez*, 509 F.3d 392, 400-01 (7th Cir. 2007) (holding that arrest of a motorist who violated the Illinois Motor Code by improperly pulling over to the side of the road did not violate the Fourth Amendment); *Chortek v. City of Milwaukee*, 345 F.3d 740, 745 (7th Cir. 2004) ("Arrest for a minor, non-jailable offense does not violate the Fourth Amendment.").

Although Swanigan claims that all of the Individual Officer Defendants falsely arrested him, the record shows that many of the officers did not have contact with him until well after he had been

taken into custody. Only Trotter, Muehlfelder, Kaupert and Montalvo were present at the Labe Bank parking lot at the time of Swanigan's arrest. "An individual cannot be held liable in a § 1983 action unless she caused or participated in an alleged constitutional deprivation." *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983). Because Trotter, Muehlfelder, Kaupert and Montalvo are the only officers that could have arrested Swanigan, all other individual officer defendants who did not have personal involvement in Swanigan's arrest are entitled to judgment as a matter of law with respect to Swanigan's false arrest claim.

The remaining officers arrested Swanigan in Labe Bank's parking lot for operating a vehicle that had suspended registration. The Illinois Motor Vehicle Code prohibits the operation of a vehicle upon any highway if that vehicle has a suspended registration. *See* 625 ILCS 5/3-702(a)(1). A "highway" is "[t]he entire width between the boundary lines of every way publicly maintained when any part thereof is open to the use of the public for purposes of vehicular travel or located on public school property." 625 ILCS 5/1-126. A privately owned parking lot is a "highway" for purposes of the Illinois Motor Vehicle Code only if it is publicly maintained and open to use by the public for vehicular travel. *See People v. Helt*, 892 N.E.2d 594, 597 (Ill. App. Ct. 2008); *see also People v. Culbertson*, 630 N.E.2d 489, 491 (Ill. App. Ct. 1994) (publicly maintained train station parking lot constituted a "highway"); *People v. Kozak*, 264 N.E.2d 896, 898 (Ill. App. Ct. 1970) (grocery store's privately owned and privately maintained parking lot did not constitute a "highway").

Here, when the officers observed Swanigan attempting to start his car in the bank's parking lot, they received a LEADS report that his vehicle had a suspended registration for a mandatory insurance violation. After verifying with the police dispatch service that the vehicle's registration was suspended, Trotter and Muehlfelder approached Swanigan and arrested him after he started the

vehicle's engine. The record is silent as to whether Labe Bank's parking lot was a privately owned and privately maintained lot rather than a "highway" under the Illinois Motor Vehicle Code. Therefore, the officers may not have had probable cause to believe that Swanigan was actually violating the traffic laws at the time they arrested him. Nonetheless, based on the information available to them when they made contact with Swanigan, a reasonable person would have believed that Swanigan was about to commit the offense of operating a vehicle with a suspended registration. Regardless of whether Labe Bank's parking lot is publicly or privately maintained, a reasonable person would have expected Swanigan to exit the parking lot after starting the vehicle. Once he exited the parking lot, he would have operated the vehicle with suspended registration on either Elston Avenue or Pulaski Street, two roads adjacent to Labe Bank that are "highways" under the Illinois Motor Vehicle Code.

Moreover, a reasonable person would have believed that Swanigan committed the offense of operating the vehicle with a suspended registration on a public highway for his car to be in Labe Bank's parking lot at all. The LEADS report that Trotter and Muehlfelder relied upon indicated that the registration for Swanigan's vehicle had been suspended since May 8, 2006, approximately three months and a half months before they observed the car in the parking lot. Swanigan drove the vehicle to Labe Bank that day to conduct a banking transaction. To access the bank's parking lot, motorists must travel on public highways such as Elston Avenue and Pulaski Street. Therefore, when Trotter and Muehlfelder observed Swanigan starting his car in the Labe Bank parking lot on August 22, 2006, they had probable cause to believe that he had operated the vehicle on public highways after the vehicle's registration had been suspended.

Swanigan claims that probable cause did not exist to believe that he violated the Illinois Motor Vehicle Code because his vehicle's registration was not actually suspended on August 22,

2006. Regardless of whether the vehicle's registration was suspended on that date, the information available to Trotter and Muehlfelder at the time of the arrest indicated that the registration for Swanigan's vehicle had been suspended. Even if subsequently discovered information showed that the vehicle's registration was not suspended at the time of the arrest, the officers had probable cause to believe that Swanigan was about to illegally operate his vehicle. *See Thompson v. Wagner*, 319 F.3d 931, 934 (7th Cir. 2003) ("Whether probable cause exists turns on the information known to the officers at the moment the arrest was made, not on subsequently received information."). At the time of the arrest, Trotter and Muehlfelder had received reports from LEADS and dispatch that the registration for Swanigan's vehicle was suspended. Therefore, at the time the officers arrested Swanigan, they had probable cause to believe that Swanigan had operated his vehicle illegally and that he was about to operate his vehicle illegally. Because they had probable cause to believe that he had committed a traffic offense, they had probable cause to arrest him. Therefore, Trotter, Muehlfelder, Kaupert and Montalvo are entitled to judgment as a matter of law with respect to Swanigan's false arrest claim.

Additionally, the officers arrested Swanigan for failure to provide them with proof of automobile insurance. In Illinois, "[a]ny person who fails to comply with a request by a law enforcement officer for display of evidence of insurance . . . shall be deemed to be operating an uninsured motor vehicle" in violation of the Illinois Motor Vehicle Code. 625 ILCS 5/3-707(b). Here, when Trotter and Muehlfelder asked Swanigan to produce his driver's license and proof of insurance, he only produced his driver's license. Although he claims that he later informed the officers that his proof of insurance was located in the glove compartment of his vehicle, the statute requires a motorist to display the documentation upon request or be deemed to be operating an uninsured vehicle. It is of no consequence that he had valid insurance at the time that he failed to

produce the documentation because the statute's plain language requires motorists to produce documentation on request. Because he failed to produce his insurance documentation after law enforcement officers asked to see it, the officers also had probable cause to believe that Swanigan violated 625 ILCS 5/3-707(b), which in turn gave them probable cause to arrest him. Accordingly, even if they did not have probable cause to believe that he operated a vehicle with suspended registration, Trotter, Muehlfelder, Kaupert and Montalvo would be entitled to summary judgment on Swanigan's false arrest claim because they also had probable cause to believe that he violated 625 ILCS 5/3-707(b).

Although Swanigan claims that the officers used excessive force against him in his opposition to Defendants' Motion for Summary Judgment, Swanigan does not state a claim for excessive force in his Third Amended Complaint. Parties may not amend their pleadings through arguments raised in briefs opposing summary judgment. *See Speer v. Rand McNally & Co.*, 123 F.3d 658, 665 (7th Cir. 1997) (citing *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996)). False arrest claims and excessive force claims are distinct claims. *See Duran v. Sirgedas*, 240 Fed. Appx. 104, 131 n.17 (7th Cir. 2007) (citing *Cortez v. McCauley*, 478 F.3d 1108, 1127 (10th Cir. 2007) (noting that the inquiries into excessive force and false arrest "are separate and independent.")). Because Swanigan did not plead a cause of action for excessive force in his Third Amended Complaint, he may not attempt to package an excessive force claim with his false arrest claim at the summary judgment stage.

ii.     Unlawful Detention

Swanigan claims that all Defendants unlawfully detained him because the police kept him in custody for over fifty hours without a judicial determination of probable cause. All officers

except for Porebski, Dillon, Woitowich, Anderson, Mullane, Lynch and Guajardo have moved for summary judgment on Swanigan's unlawful detention claim.

Although Swanigan's Third Amended Complaint alleges that all Defendants are liable to him for unlawful detention, he only contends that Trotter, Muehlfelder, Frazier, Porebski, Dillon, Woitowich, Anderson, Mullane, Lynch and Guajardo "should stand trial on the unlawful detention claim." Swanigan Resp. Br. at 7. Because the record shows that Poremba, Reyes, Kaupert and Montalvo did not personally take any actions that led to Swanigan's detention lasting in excess of 48 hours without a judicial determination of probable cause, those officers are entitled to summary judgment on Swanigan's unlawful detention claim.

The Fourth Amendment's requirement of reasonable seizures dictates that arrestees receive a judicial determination of probable cause promptly after an arrest or detention. *See Gerstein v. Pugh*, 420 U.S. 103, 114 (1975). Once the arresting officer completes the administrative steps incident to the arrest, "the police must take the suspect before a magistrate to establish probable cause, or they must let him go." *Grameros v. Jewel Cos., Inc.*, 797 F.2d 432, 437 (7th Cir. 1986). If the arrestee does not receive a probable cause determination within 48 hours of a warrantless arrest, "the government must demonstrate the existence of an emergency or other extraordinary circumstance to justify its failure to promptly present the person arrested to a judicial officer for a probable cause determination." *Lopez v. City of Chicago*, 464 F.3d 711, 714 (7th Cir. 2006); *see also County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991). Delays that occur to allow law enforcement to gather additional evidence or conduct lineups related to other, uncharged crimes are per se unreasonable. *See Lopez*, 464 F.3d at 714; *Willis v. City of Chicago*, 999 F.2d 284, 288-89 (7th Cir. 1993) (finding that 45 hour detention was unreasonable when police prolonged the

detention to place the arrestee in lineups to investigate crimes unrelated to the offense that gave rise to the arrest).

Here, Trotter and Muehlfelder, the arresting officers, took Swanigan to the police station at 4:20 p.m. on August 22, 2007. After they prepared the paperwork relating to the arrest and informed detectives of their suspicion that Swanigan was the Hard Hat Bandit, Trotter and Muehlfelder escorted Swanigan to the police station's lockup, where Porebski reviewed the police reports and placed Swanigan in a holding cell at 7:17 p.m. After they dropped Swanigan off at the police station's lockup, Trotter and Muehlfelder did not have any further contact with Swanigan. They did not place the hold on Swanigan so that police could investigate the Hard Hat Bandit and Popeye's Chicken robberies or conduct lineups into crimes unrelated to Swanigan's traffic violation. Once they left Swanigan at the lockup, they had no personal involvement in Swanigan's detention. An arresting officer is not responsible for the plaintiff's detention once he turns the plaintiff over to jailers at the police station. *See Tibbs v. City of Chicago*, 469 F.3d 661, 665 (7th Cir. 2006) (citing *Brown v. Patterson*, 823 F.2d 167, 169 (7th Cir. 1987)). Within approximately three hours of arresting Swanigan, Trotter and Muehlfelder turned Swanigan over to the police officers in charge of the lockup. Once they turned him over, the arresting officers had no contact with Swanigan during his detention. Swanigan makes no claim that the failure to bring him before a judge for a probable cause determination in the three hours that elapsed between his arrest and his final contact with Trotter and Muehlfelder was unreasonable. Because Trotter and Muehlfelder had no responsibility for Swanigan's detention once they brought him to the police station's lockup, they cannot be liable for any unreasonable detention that occurred after their contact with him ended.

With respect to Frazier's involvement in Swanigan's detention, the record reveals that Frazier conducted lineups in conjunction with the FBI's investigation into the Hard Hat Bandit while

other officers conducted lineups for the Chicago Police Department's investigation of the Popeye's Chicken Robbery. During the detention, Swanigan remained in police custody for a total of 51.1 hours although he became eligible for release when his fingerprints cleared after he had been in custody for eight hours. After his fingerprints cleared, the police held Swanigan in custody for the sole purpose of investigating two sets of unrelated crimes: the Hard Hat Bandit robberies and the Popeye's Chicken Robbery. While the record does not reveal the amount of time it took Frazier to conduct the Hard Hat Bandit lineups with Swanigan, Frazier had contact with Swanigan from the early afternoon until the evening on August 23, 2006. Aside from gathering evidence for the two sets of robberies, Frazier has not offered justification for the failure to obtain a judicial determination of probable cause within 48 hours of Swanigan's arrest. Because Frazier has not satisfied his burden of providing reasonable justification for holding Swanigan in custody for more than 48 hours to investigate other crimes, he is not entitled to summary judgment on Swanigan's unreasonable detention claim.

### iii.  Unreasonable Search and Seizure of the Vehicle

In Count III, Swanigan claims that the officers illegally searched his car after arresting him. Swanigan concedes that the legality of the search and seizure of the vehicle depends upon the legality of his arrest. Swanigan Resp. Br. at 6. With respect to the search of a vehicle, "when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." *New York v. Belton*, 453 U.S. 454, 460 (1981); *see also Michigan v. Long*, 463 U.S. 1032, 1050 (1983); *Ochana v. Flores*, 347 F.3d 266, 271 (7th Cir. 2003). As an initial matter, only Trotter, Muehlfelder, Kaupert and Montalvo were present during the search of Swanigan's vehicle. Therefore, all other individual officer defendants are entitled to summary judgment with respect to

Count III because they did not have personal involvement in the search and seizure of the vehicle. Additionally, because the Court has determined that Trotter and Muehlfelder lawfully arrested Swanigan in the Labe Bank parking lot, the police on the scene were entitled to execute a contemporaneous search of the vehicle incident to the arrest. Accordingly, Trotter, Muehlfelder, Kaupert and Montalvo are entitled to summary judgment on Swanigan's claim for unreasonable search and seizure of the vehicle.

iv.      Due Process - Conditions of Confinement

Count IV of Swanigan's Third Amended Complaint alleges that all individual officers engaged in a conspiracy and acted individually to subject him to unreasonable conditions of confinement. To establish a conspiracy claim under § 1983, the plaintiff must put forth evidence that the defendants reached an agreement to deprive him of his constitutional rights and that the plaintiff actually suffered a deprivation as a result of the overt acts taken in furtherance of the agreement. *See Scherer v. Balkema*, 840 F.2d 437, 441-42 (7th Cir. 1988). To defeat a defendant's motion for summary judgment on a § 1983 conspiracy claim, the plaintiff must demonstrate the existence of an agreement or acts "sufficient to raise the inference of mutual understanding" between the defendants. *Admunsen v. Chicago Park Dist.*, 218 F.3d 712, 718 (7th Cir. 2000) (quoting *Kunik v. Racine County, Wisc.*, 946 F.2d 1574, 1580 (7th Cir. 1991)).

Here, Swanigan made no argument in opposition to Defendants' Motion for Summary Judgment with respect to his conspiracy claim. The record contains no evidence to suggest that the officers reached an agreement to subject Swanigan to unreasonable conditions of confinement. Most of the officers did not even have contact with each other during the course of Swanigan's arrest and detention. Because the record does not contain evidence sufficient to raise the inference that the officers reached a mutual understanding to deprive Swanigan of his constitutional rights, all officers

are entitled to judgment a matter of law on Count IV to the extent that Swanigan attempts to proceed under a conspiracy theory.

Swanigan also claims that each officer acted individually to subject him to unreasonable conditions of confinement. Despite that assertion, in his opposition to Defendant's Motion for Summary Judgment, he indicates that only Trotter, Muehlfelder, Lynch, Mullane, Reyes and Poremba had personal responsibility for the conditions of his confinement. Swanigan Resp. Br. at 12. Because § 1983 requires personal involvement as a prerequisite to personal liability, all officers except for Trotter, Muehlfelder, Lynch, Mullane, Reyes and Poremba are entitled to summary judgment with respect to Count IV of Swanigan's Third Amended Complaint.

Once a state takes a person into its custody, it assumes an obligation to provide for his basic needs, including "food, clothing, shelter, medical care, and reasonable safety." *DeShaney v. Winnebago County Dept. of Social Servs.*, 489 U.S. 189, 200 (1989). Courts evaluate claims regarding the conditions of confinement for pretrial detainees who have not had a judicial determination of probable cause under the Fourth Amendment's reasonableness standard. *See Williams*, 509 F.3d at 403; *Lopez*, 464 F.3d at 719. To support his unreasonable conditions of confinement claim against Trotter, Muehlfelder, Lynch, Mullane, Reyes and Poremba, Swanigan points to the following incidents that occurred during his detention: 1) Trotter handcuffing him too tightly in the holding cell; 2) having his shirt taken away from him while he tried to sleep during the night of August 22, 2006; 3) not receiving meals during the time of his detention; and 4) having officers ignore his requests to use the restroom. Additionally, Swanigan claims that Poremba "exacerbated the conditions of Swanigan's confinement" when he reviewed the Popeye's Chicken Robbery and closed the investigation as "cleared."

With respect to the claim against Trotter, the fingers on one of Swanigan's hands went numb and the handcuffs caused welt marks on his wrists when Trotter handcuffed him in the holding cell. Besides Trotter, no officers were involved in handcuffing Swanigan in the holding cell. Therefore, Muehlfelder, Lynch, Mullane, Reyes and Poremba are entitled to summary judgment with respect to Swanigan's claim that handcuffing him in the holding cell created an unreasonable condition of confinement. When police officers use handcuffs to restrain arrestees, they "may not knowingly use handcuffs in a way that will inflict unnecessary pain or injury on an individual who presents little or no risk of flight or threat of injury." *Stainback v. Dixon*, — F.3d —, 2009 WL 1855169, at *4 (7th Cir. June 30, 2009) (citing *Herzog v. Vill of Winnetka, Ill.*, 309 F.3d 1041, 1043 (7th Cir. 2002)). Whether an officer knows that the use of handcuffs will cause unnecessary pain or injury depends on the surrounding circumstances. *See id.* ("In some cases, the fact that an act will cause pain or injury will be clear from the nature of the act itself.") Even if an officer makes the handcuffs too tight, if the injury is not apparent to the officer or if the arrestee has not informed the officer of the injury, a reasonable officer is not expected to accommodate the injury. *See id.* For example, an arresting officer did not act unreasonably when he fastened handcuffs too tightly but the arrestee, whose injuries did not require medical care, made one general complaint about the handcuffs without elaborating on the injury, numbness or degree of pain that he experienced. *See Tibbs*, 469 F.3d at 666.

Here, Trotter handcuffed Swanigan in the holding cell, filled out paperwork regarding the arrest and returned to the holding cell to take Swanigan to the police station's lockup. Although the handcuffs were too tight and caused redness on his wrists and numbness in his fingers, nothing in the record indicates that Trotter intentionally used the handcuffs to cause unnecessary pain or injury or that it would have been apparent to Trotter that the handcuffs would cause pain. As in *Tibbs*,

Swanigan did not require medical treatment for his pain. Additionally, unlike the plaintiff in *Tibbs*, Swanigan did not make even a general complaint that the handcuffs caused him pain, let alone a complaint that described the numbness he felt in his fingers or degree of pain that he experienced. Because the record indicates that Trotter acted reasonably when he handcuffed Swanigan, to the extent that Swanigan claims that he experienced unreasonable conditions of confinement when Trotter handcuffed him in the holding cell, Trotter is entitled to judgment as a matter of law.

Swanigan also seeks to hold Trotter, Muehlfelder, Lynch, Mullane, Reyes and Poremba liable for unreasonable conditions of confinement because an unidentified officer took his shirt away from him and several unidentified officers ignored his requests to use the restroom. After the unidentified officers ignored his requests to use the restroom, Swanigan urinated on the floor on two separate occasions. Although Swanigan seeks to hold Trotter, Muehlfelder, Lynch, Mullane, Reyes and Poremba liable for those acts, it was other, unidentified the officers who took Swanigan's shirt away from him or ignored his requests to use the restroom. Muehlfelder, Lynch, Mullane and Poremba had no personal involvement in these incidents. Therefore, Swanigan cannot hold them liable for taking his shirt or refusing his requests to use the restroom.

Trotter and Reyes only became involved when they entered Swanigan's cell after he had urinated on the floor. After Swanigan urinated on the floor for the first time, Trotter told him to remain in the cell and "sit here in this piss." When Reyes entered Swanigan's cell after Swanigan had urinated on the floor for the second time, once Reyes stepped in the urine, he cursed at Swanigan before placing him in shackles to escort him to the room where police would conduct the lineups. Therefore, Trotter and Reyes did not ignore Swanigan's requests to use the restroom before he urinated on the floor because they only had contact with Swanigan after he urinated on the floor. Although Trotter told Swanigan to "sit in the piss," nothing in the record indicates that Swanigan

actually sat in the urine while in police custody. In fact, minutes after Trotter discovered the urine on the floor, Trotter and Muehlfelder removed Swanigan from the holding cell and took him to the police station's lockup. Similarly, Reyes moved Swanigan from the room with urine on the floor to the lineup room once he noticed that Swanigan had urinated on the floor. While Trotter and Reyes each made derogatory statements to Swanigan after they noticed the urine, § 1983 does not provide redress for every rude or insensitive comment that police officers make to arrestees. *See DeWalt v. Carter*, 224 F.3d 607, 612 n.3 (7th Cir. 2000) (finding use of unprofessional and derogatory language, by itself, does not violate the constitution); *Kernats v. O'Sullivan*, 35 F.3d 1171, 1174 (7th Cir. 1994) ("[E]very official abuse of power, even if unreasonable, unjustified, or outrageous, does not rise to the level of a federal constitutional deprivation . . . . Some such conduct may simply violate state tort law or indeed may be perfectly legal, though unseemly and reprehensible."). Because the comments that Trotter and Reyes made after discovering that Swanigan had urinated on the floor do not rise to the level of a constitutional deprivation, Trotter and Reyes are entitled to summary judgment to the extent that Swanigan bases his unreasonable conditions of confinement claim against them on their comments.

Swanigan also claims that Trotter, Muehlfelder, Lynch, Mullane, Reyes and Poremba subjected him to unreasonable conditions of confinement by failing to feed him during his detention. In support of this assertion, without citation to any law, Swanigan only makes the conclusory statement that the police did not feed him "anything even resembling regular meals over a two day period." Swanigan Resp. Br. at 12. Failure to properly develop an argument with citation to relevant legal authority constitutes a waiver. *See, e.g., Kramer v. Banc of Am. Sec., LLC*, 355 F.3d 961, 964 n.1 (7th Cir. 2004) ("We have repeatedly made clear that perfunctory and underdeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even when those

arguments raise constitutional issues)."); *United States v. Amerson*, 185 F.3d 676, 689 (7th Cir.

1999) ("[G]iven our adversarial system of litigation, it is not the role of this Court to research and

construct legal arguments open to the parties, *especially when they are represented by counsel*.")

(emphasis added). The Court recognizes that a party opposing summary judgment does not need

to cite additional legal authority, provided that the argument depends on the application of facts to

the legal standard already presented in the moving party's brief. *See Davis v. Carter*, 452 F.3d 686,

692 (7th Cir. 2006). Yet, with respect to Swanigan's claim that he experienced unreasonable

conditions of confinement because he did not receive meals, his Response Brief fails to raise any

arguments that depend on the application of facts to the legal standards already presented to the

Court. Instead, his Response Brief contains perfunctory arguments unsupported by pertinent

authority. Because Swanigan failed to develop his argument regarding the conditions of his

confinement based upon a lack of food and failed to cite to any authority to support it, he has waived

the claim.

More importantly, during the detention that lasted for approximately two days, Swanigan

refused food that police offered to him on two separate occasions. He refused to eat pizza on August

22, 2006 because it did not look appetizing to him. When the people around him in the lineup room

ate bologna sandwiches and chips and drank soft drinks, Swanigan refused to eat food that the police

offered to him because he preferred to eat fruit, vegetables or granola. After he met with his father

in the early evening of August 23, 2006, he ate the apples, bananas and grapes that his father gave

him. Additionally, Frazier gave Swanigan a salad to eat for dinner that night. The record is silent

regarding what Swanigan ate on August 24, 2006 until his release at 7:30 p.m. While the record

does not contain detailed information about everything that Swanigan ate during the detention, it

does establish that the lockup at the 17th District Station had turkey bologna and white bread available to feed to detainees and that Swanigan twice refused to eat food offered to him.

The Fourth Amendment requires states to reasonably provide detainees with life's basic necessities, including food. *See DeShaney*, 489 U.S. at 200; *Lopez*, 464 F.3d at 719. Pretrial detainees have a right to "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to [their] health and well being." *French v. Owens*, 777 F.2d 1250, 1255 (7th Cir. 1985). Prisoners are free to refuse food unless prison officials know that the refusal endangers their health. *See Freeman v. Berge*, 441 F.3d 543, 547 (7th Cir. 2006) (prisoner's refusal of food for eight days not a deprivation when "there is no indication that [the prisoner's] life or health was jeopardized."). Here, nothing in the record indicates the food offered to Swanigan was nutritionally inadequate or presented an immediate danger to his health and well being. Although he believed that the pizza looked unappetizing and he preferred eating fruits, vegetables and granola, he has put forth no evidence that the available food was constitutionally deficient. Furthermore, nothing in the record indicates that the officers acted unreasonably in allowing Swanigan to refuse food on two occasions because the record contains no evidence that the officers knew that the refusals endangered his health. In fact, the record is devoid of any evidence that Swanigan's refusals actually endangered his health. Additionally, although there was food in the lockup for detainees to eat, nothing suggests that Swanigan ever asked for it after he refused the food that the police offered him. Therefore, even if Swanigan had not waived his unreasonable conditions of confinement claim based on a lack of food, the officers would be entitled to summary judgment on that claim.

In his final unreasonable conditions of confinement claim, Swanigan asserts that Poremba exacerbated "the effect of plaintiff's conditions of confinement on plaintiff's well-being." Swanigan

Resp. Br. at 12. Approximately six weeks after the police released Swanigan from custody, Poremba reviewed the reports of the Detective Division relating to the Popeye's Chicken Robbery and marked the case file as "cleared" while indicating that eyewitnesses identified Swanigan as the perpetrator and that the prosecutor refused to approve charges against him. Swanigan offers no legal support for the novel proposition that reviewing a case file six weeks after an arrestee's confinement ends can constitute an unreasonable condition of confinement. Ignoring the fact that Poremba had no contact with Swanigan during the period of Swanigan's confinement, Swanigan does not indicate how approving an accurate and truthful police report violates any of his constitutional rights, let alone his right against unreasonable confinement. When Poremba marked the case file as "cleared," he did not deprive Swanigan of his rights to receive life's basic necessities of food, water, shelter, clothing and medical treatment. Therefore, Poremba is entitled to summary judgment on Swanigan's claim that marking the case file as "cleared" constituted an unreasonable condition of confinement.

### v.     Denial of Access to Counsel

In Count V of his Third Amended Complaint, Swanigan alleged a violation of his Sixth Amendment right to counsel. He claims that had the police honored his request for an attorney, the attorney would have been able to stop interrogation relating to the Hard Hat Bandit and Popeye's Chicken Robbery. After all individual officer defendants moved for summary judgment on Count V, Swanigan made absolutely no opposition or reference to their arguments in support of summary judgment. "A failure to oppose an argument permits an inference of acquiescence and acquiescence operates as a waiver." *Wojtas v. Capital Guardian Trust Co.*, 477 F.3d 924, 926 (7th Cir. 2007) (citing *Cincinnati Ins. Co. v. E. Atl. Ins. Co.*, 260 F.3d 742, 747 (7th Cir. 2001)). Because Swanigan

offered no opposition to the individual officer defendants' Motion for Summary Judgment with respect to Count V, Swanigan has waived that claim.

Waiver aside, the Sixth Amendment right to counsel only attaches at the initiation of adversary judicial proceedings. *See Watson v. Hulick*, 481 F.3d 537, 542 (7th Cir. 2007). Until the time of a formal charge, indictment, information or arraignment, a suspect does not have a right to counsel under the Sixth Amendment. *See id.* ("[I]nterrogation of a suspect before the filing of a charge, without more, does not trigger the right to counsel.") Here, adversary proceedings against Swanigan with respect to the Hard Hat Bandit Robberies and Popeye's Chicken Robbery never began. Therefore, his Sixth Amendment right to counsel never attached. Accordingly, if Swanigan had not waived his claim for violation of his rights under the Sixth Amendment, the individual defendant officers would have been entitled to judgment as a matter of law.

B.     State Law Claims

In addition to his claims arising under federal law, Swanigan brought supplemental state law claims against all officers for intentional infliction of emotional distress, malicious prosecution with respect to the traffic violations, malicious prosecution with respect to the municipal ordinance violation and conversion. As a preliminary matter, the Illinois Local Governmental and Governmental Employees Tort Immunity Act sets forth a one year statute of limitations for bringing tort claims against municipal employees. *See* 745 ILCS 10/8-101(a); *Williams v. Lampe*, 399 F.3d 867, 870 (7th Cir. 2005) (finding that one year limitations period applies to Illinois claims against municipal employees joined with § 1983 claims). Trotter and Muehlfelder arrested Swanigan on August 22, 2006 and a state court dismissed the traffic and weapon charges against him in late September, 2006. Swanigan filed his Complaint on August 22, 2007, naming "Robert Trotter, Scott Mulane, Chicago Police Officers Mueller, Reyes, Ramirez [and] Unknown Number of Unnamed

Officers of the Chicago Police Department . . . ." as defendants. On October 19, 2007, Swanigan filed his First Amended Complaint to add Muehlfelder as a defendant. The First Amended Complaint did not state claims against Mulane, Mueller or Ramirez, who are no longer parties to this action.[10] In the Second Amended Complaint, filed on December 13, 2007, Swanigan added Lynch, Mullane, Porebski, Poremba, Woitowich, Guajardo, Kavanaugh, Orsa, Rogus, Switalla and Uginchus as defendants. Kaupert, Montalvo, Frazier, Beazley, Dillon and Anderson did not become defendants in the action until Swanigan filed his Third Amended Complaint on August 11, 2008.

Therefore, of the current defendants, only Trotter and Reyes were defendants when the statute of limitations for Swanigan's state law claims expired on August 23, 2007. Nonetheless, amended complaints that name new defendants after the expiration of the applicable statute of limitations relate back to the date of the original pleading if: 1) the law providing the applicable statute of limitations allows relation back; 2) the amendment asserts a claim that arose out of the conduct, transaction or occurrence set out in the original pleading; and 3) the new defendant, who knew or should have known that the action would have been brought against him or her, but for a mistake concerning the proper party's identity, received notice of the action within 120 days of the date of the original pleading. *See* Fed. R. Civ. P. 15(c). Swanigan makes no argument that his state law claims against the other officers relate back to his timely filed Complaint. Additionally, in his opposition to Defendants' Motion for Summary Judgment, Swanigan only references the claims against Trotter and Reyes. Therefore, he has waived any claim that his Amended Complaints relate back to the original, timely filed Complaint. More importantly, nothing in the record indicates that

---

[10] It is not clear from the record whether Swanigan actually had contact with individuals named Scott Mulane and Officers Mueller and Ramirez during his arrest and confinement or if he attempted to name Kevin Mullane, Thomas Muehlfelder and another officer as defendants before learning of their proper names.

the officers brought into the litigation through Swanigan's Amended Complaints had any knowledge of this action such that they knew or should have known that the action would have been brought against them but for a mistake concerning their identity. Because the applicable statute of limitations expired before Swanigan brought his state law claims against Lynch, Mullane, Porebski, Poremba, Woitowich, Guajardo, Kavanaugh, Orsa, Rogus, Switalla, Uginchus, Kaupert, Montalvo, Frazier, Beazley, Dillon and Anderson, those officers are entitled to judgment as a matter of law with respect to claims arising under Illinois law against them.

I.    Intentional Infliction of Emotional Distress

Under Illinois law, a plaintiff must establish the following elements to succeed on a claim of intentional infliction of emotional distress: 1) extreme and outrageous conduct; 2) intent to inflict severe emotional distress or knowledge that a high probability existed that the conduct would cause severe emotional distress; and 3) the conduct actually caused severe or extreme emotional distress suffered. *See Feltmeier v. Feltmeier*, 798 N.E.2d 75, 80 (2003). Courts use an objective standard to determine whether behavior rises to the level extreme and outrageous conduct, considering any power or influence imbalances, the likelihood that the threatened action could be carried out and the defendant's awareness of the plaintiff's susceptibility to physical or mental stress. *See Thomas v. Fuerst*, 803 N.E.2d 619, 935 (Ill. App. Ct. 2004); *see also Lopacich v. Falk*, 5 F.3d 210, 212 (7th Cir. 1993) (applying Illinois law). "Liability attaches only in circumstances where the defendant's conduct is so outrageous and extreme that it goes beyond all possible bounds of decency." *Tuite v. Corbitt*, 830 N.E.2d 779, 899 (Ill. App. Ct. 2005), *rev'd on other grounds*, 866 N.E.2d 114 (Ill. 2006). Mere insults, indignities or threats are not actionable. *See Pub. Fin. Corp. v. Davis*, 360 N.E. 2d 765, 767-68 (Ill. 1976). Additionally, the resultant emotional distress must be so severe that no reasonable person could be expected to endure it, considering the intensity and the duration of the

distress. *See McGrath v. Fahey*, 533 N.E.2d 806, 806 (Ill. 1988); *see also Kleidon v. Rizza Chevrolet, Inc.*, 527 N.E.2d 374, 377 (Ill. App. Ct. 1988) ("Although fright, horror, grief, shame, humiliation, worry, etc. may fall within the ambit of the term 'emotional distress,' these mental conditions alone are not actionable.").

Here, Swanigan claims that Trotter and Reyes inflicted emotional distress on him because they arrested him, investigated uncharged crimes and mocked him after he urinated on the floor of his cell on two occasions. To the extent that he bases his claim on the arrest and investigation, "[t]here is nothing inherently extreme and outrageous about [the police] conducting investigations or inspecting or questioning or suspecting." *Schiller v. Mitchell*, 828 N.E.2d 323, 334 (Ill. App. Ct. 2005). Swanigan also claims that he experienced emotional distress because Trotter and Reyes each told him to sit in his urine when they discovered that he had urinated on the floor of his cell. As previously discussed, although Trotter told Swanigan to "sit in the piss" and Reyes cursed at Swanigan for urinating in the cell, each officer removed Swanigan from the cell shortly after discovering the urine on the floor. The statements that Trotter and Reyes made amount to mere indignities that are not actionable because the officers did not engage in conduct that goes beyond the bounds of decency. More critically, even if the comments that Trotter and Reyes made to Swanigan regarding the urination did constitute extreme and outrageous behavior, nothing in the record indicates that the statements caused Swanigan to experience the type of severe emotional distress that no reasonable person could endure. Because the record shows that Trotter and Reyes did not engage in extreme and outrageous conduct towards Swanigan and that the comments that provide the basis for their claim did not cause him severe emotional distress, Trotter and Reyes are entitled to judgment as a matter of law with respect to Swanigan's claim for intentional infliction of emotional distress.

ii.     Malicious Prosecution Regarding Traffic Tickets

Swanigan also attempts to proceed against Trotter and Reyes for malicious prosecution, claiming that they caused the commencement of a proceeding against him for traffic violations under 625 ILCS 5/3-702 (operation of a vehicle with suspended registration) and 625 ILCS 5/3-707 (operation of a motor vehicle without insurance).  To establish malicious prosecution, a plaintiff must show: "1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; 2) the termination of the proceeding in favor of the plaintiff; 3) the absence of probable cause for such proceeding; 4) the presence of malice; and 5) damages resulting to the plaintiff . . . ." *Swick v. Liautaud*, 662 N.E.2d 1238, 1242 (Ill. 1996).  Malice is present when a prosecution is initiated for any reason other than to bring a party to justice.  *See Rodgers v. Peoples Gas, Light and Coke Co.*, 733 N.E.2d 835, 842 (Ill. App. Ct. 2000); *see also Aguirre v. City of Chicago*, 887 N.E.2d 656, 663 (Ill. App. Ct. 2008) ("a plaintiff may demonstrate malice by showing that the [officer] proceeded with the prosecution for the purpose of injuring the plaintiff or for some other improper motive").  A lack of probable cause does not itself show malice and a jury may only infer malice from a lack of probable cause to arrest if there is no other credible evidence which refutes that inference.  *See Rodgers*, 733 N.E.2d at 842.  A defendant must have played a significant role in causing a prosecution in order to be held liable for malicious prosecution.  *See id.*; *Reed v. City of Chicago*, 77 F.3d 1049, 1053 (7th Cir. 1996).  In contrast to the false arrest context, probable cause as to one charge will not preclude a claim for malicious prosecution arising from a different charge.  *See Holmes*, 511 F.3d at 683.

Here, Reyes only had brief contact with Swanigan at the Area 5 Detective Division when he took him from a holding cell to the room where other detectives conducted lineups in conjunction with the investigations into the Popeye's Chicken Robbery and the Hard Hat Bandit robberies.

36

Swanigan makes no argument that Reyes had a significant role in causing the prosecution of Swanigan for traffic or weapons charges. Reyes only had brief contact with Swanigan when he escorted Swanigan from a holding area to a lineup room. Nothing in the record indicates that Reyes had any role in causing the prosecution of Swanigan for his traffic charges or the weapons charge, let alone a significant one. Therefore, Reyes is entitled to judgment as a matter of law with respect to Counts VII and VIII.

With respect to Trotter, the Court has already determined that probable cause existed to believe that Swanigan had operated a motor vehicle with suspended registration in violation of 625 ILCS 5/3-702 and that he failed to produce his insurance documentation in violation of 625 ILCS 5/3-707. A finding of probable cause serves as an absolute bar to a claim of malicious prosecution. *See Holmes*, 511 F.3d at 682 (citing *Mannoia v. Farrow*, 476 F.3d 453, 459 (7th Cir. 2007) (applying Illinois law)). Accordingly, because Trotter had probable cause to believe that Swanigan committed the traffic violations charged, he is entitled to judgment as a matter of law with respect to Count VII.

iii.     Malicious Prosecution Regarding Municipal Ordinance Violation

In Count VIII of his Third Amended Complaint, Swanigan claims that all individual defendant officers maliciously caused false allegations of a violation of § 8-20-015 of the Municipal Code of Chicago, entitled "Unlawful firearm or laser sight accessory in motor vehicle." Because the Court has already determined that Swanigan's state law claims are time-barred against all officers except for Trotter and Reyes and that Reyes is entitled to summary judgment on Count VIII, Trotter is the only defendant remaining with respect to Count VIII.

Here, Trotter prepared an arrest report indicating that Swanigan had a knife in his vehicle in violation of § 8-24-020 of the Municipal Code of Chicago. Swanigan does not use that charge as the basis for his malicious prosecution claim; instead, he relies on the firearms charge that the

prosecution non-suited.[11]  However, nothing in the record indicates that Trotter initiated the firearms

charge against Swanigan.  The record establishes that Trotter prepared his arrest report to reflect

citations against Swanigan for the two traffic violations and the knife charge.  At some point

between August 22, 2006 and September 1, 2006, something caused the notice of administrative

hearing sent to Swanigan to reflect a firearms charge but the record contains no evidence to explain

how the charge for the firearms offense arose.  Most critically, nothing in the record suggests that

Trotter accessed his arrest report after he originally prepared it on August 22, 2006, let alone that

Trotter changed his report to include a citation for the firearms offense.  While many explanations

could justify the appearance of the firearms charge against Swanigan, such as malicious intent on

Trotter's part, malicious intent on some other officer's part, or a simple administrative error, the

record is devoid of any evidence to suggest that Trotter had any personal involvement in the

commencement of the firearms offense against Swanigan.  Because Swanigan has produced no

evidence to show that Trotter caused the commencement of the firearms charge against him, he

cannot establish a prima facie case of malicious prosecution with respect to that offense.

Accordingly, Trotter is entitled to judgment as a matter of law on Count VIII of Swanigan's Third

Amended Complaint.

      iv.     Conversion

     In his final claim, Swanigan claims that Trotter committed the tort of conversion when he

and Muehlfelder had Swanigan's vehicle towed after his arrest.  The elements of a conversion claim

are: 1) an unauthorized and wrongful assumption of control, dominion, or ownership by defendant

---

[11]  "The individual defendants maliciously caused false allegations of a violation of a section of the
Municipal Code prohibiting the possession of an "unlawful firearm or laser sight accessory" in a motor vehicle to be
brought and serve as a basis for the impoundment and towing of plaintiff's vehicle."  Third Am. Compl. ¶ 73.

over its property; 2) its right to the property; and 3) its absolute and unconditional right to immediate possession of the property. *See General Motors Corp. v. Douglass*, 565 N.E.2d 93, 96-97 (Ill. App. Ct. 1990). In his opposition to Defendants' Motion for Summary Judgment, Swanigan conceded that his claims relating to the search, seizure and conversion of the vehicle fail if Trotter and Muehlfelder had probable cause to arrest Swanigan. Therefore, based upon the Court's finding that probable cause to arrest Swanigan existed, Trotter is entitled to judgment as a matter of law with respect to Count IX.

III.     Swanigan's Partial Motion for Summary Judgment

A.     False Arrest

Because the Court has granted summary judgment in favor of the individual officer defendants with respect to Swanigan's claim for false arrest, his Motion for Summary Judgment with respect to Count I is denied.

B.     Unlawful Detention

Swanigan claims that he is entitled to summary judgment with respect to Count II against Trotter, Muehlfelder, Kaupert, Lynch, Mullane, Porebski, Guajardo, Woitowich, Anderson and Dillon because his detention was unreasonable under the Fourth Amendment as a matter of law. Swanigan's Motion for Summary Judgment with respect to Count II against Trotter, Muehlfelder and Kaupert is denied because the Court has already determined that Trotter, Muehlfelder and Kaupert are not responsible for the length of Swanigan's detention as a matter of law. Additionally, nothing in the record indicates who Anderson and Dillon are or what actions they took with respect to Swanigan's detention. Accordingly, Swanigan's Motion for Summary Judgment is denied with respect to Anderson and Dillon.

Although Swanigan claims that Woitowich detained him for an unreasonable amount of time in violation of the Fourth Amendment, based on the record before the Court, Woitowich had his first and only contact with Swanigan when he released Swanigan from police custody at 7:30 p.m. on August 24, 2006. Because Swanigan has put forth no evidence to show that Woitowich detained him for an unreasonable amount of time, Swanigan's Motion for Summary Judgment is denied with respect to Woitowich.

As more fully set forth in Part II.A.ii, *supra*, the Fourth Amendment's prohibition of unreasonable detentions requires a person arrested without a warrant to receive a prompt judicial determination of probable cause. *See Gerstein*, 420 U.S. at 114. If the arrestee does not receive a probable cause determination within 48 hours, the burden shifts to the government to justify the failure to obtain a prompt probable cause hearing. *See McLaughlin*, 500 U.S. at 56. It is unreasonable for the police to delay the judicial determination of probable cause so that they may gather evidence for other possible offenses. *See Lopez*, 446 F.3d at 714. For example, even a detention that lasts less than 48 hours is unreasonable when the police prolong the detention in order to place the arrestee in lineups to investigate crimes unrelated to the offense that gave rise to the arrest. *See Willis*, 999 F.2d at 288-89.

Here, after receiving information that the Hard Hat Bandit may be in custody on traffic charges, Lynch and Mullane discussed some of the evidence against Swanigan and asked Guajardo to place a hold on Swanigan in order to prevent his release once officers had processed his arrest paperwork. After Guajardo reviewed the information, he asked Porebski to place the hold on Swanigan and Porebski complied. Because of that hold, the police did not release Swanigan from custody after they prepared his arrest paperwork or after his fingerprints cleared. Once Porebski placed the hold on Swanigan, only the watch commander or the officers that requested the hold

could remove the hold. Because Lynch, Mullane, Guajardo and Porebski placed the hold, Swanigan remained in police custody for 52 hours without receiving a judicial determination of probable cause. The police officers concede that they only kept Swanigan in custody so that they could conduct lineups in connection with the investigations into the Hard Hat Bandit bank robberies and the Popeye's Chicken Robbery. Therefore, the police held Swanigan in custody for more than 48 hours without a judicial determination of probable cause solely for the purpose of investigating other crimes, an unreasonable justification as a matter of law. Because Lynch, Mullane, Guajardo and Porebski have not satisfied their burden of justifying the failure to promptly bring Swanigan before a judge for a determination of probable cause, they caused Swanigan to experience an unreasonable detention as a matter of law.

The officers claim that they are entitled to qualified immunity even if they did cause Swanigan to experience an unreasonable detention. As previously set forth, qualified immunity operates to shield officials who perform discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see Anderson v. Creighton*, 483 U.S. 635, 640 (1987) ("[I]n light of pre-existing law, the unlawfulness must be apparent."). The plaintiff bears the burden of demonstrating that a constitutional right was clearly established at the time the officials acted. *See Jacobs v. City of Chicago*, 215 F.3d 758, 766 (7th Cir. 2000). To satisfy that burden, the plaintiff may identify controlling precedent on the issue that would put a reasonable officer on notice that the action is unconstitutional. *See id*. at 767; *Sivard v. Pulaski County*, 17 F.3d 185, 189 (7th Cir. 1994) (citations omitted).

While Lynch, Mullane, Guajardo and Porebski claim that qualified immunity shields them from liability, they offer no case law to support their proposition that a reasonable officer would not

have been on notice that holding an arrestee for 52 hours without a probable cause determination solely for the purpose of investigating other crimes is unconstitutional. Since 1993, it was clearly established within this circuit that delaying judicial determinations of probable cause to investigate other crimes was unreasonable under the Fourth Amendment. *See Willis*, 999 F.2d at 288-89 (holding that arrestee "has demonstrated convincingly the unreasonableness of his prolonged detention" when officers kept him in custody for 45 hours to conduct lineups for unrelated cases). *Willis* served to place law enforcement officials on notice that *McLaughlin*'s prohibition against holding arrestees until sufficient evidence for a showing of probable cause existed for the offense giving rise to the arrest extended to investigations of other crimes as well. Here, on August 22, 2006, when Lynch, Mullane, Guajardo and Porebski placed a hold on Swanigan to keep him in custody while the investigation into the Hard Hat Bandit and Popeye's Chicken Robbery continued, based on *McLaughlin* and *Willis*, a reasonable officer would have been on notice that the action was unconstitutional. Therefore, Lynch, Mullane, Guajardo and Porebski are not entitled to qualified immunity and Swanigan is entitled to judgment as a matter of law against them with respect to Count II.

### iii. Punitive Damages

Finally, Swanigan asks the Court to "rule that, as a matter of law, the jury must award punitive damages." Swanigan Br. at 15. "[P]unitive damages are never awarded as a matter of right; the finder of fact, after reviewing the entire record, is called upon to make a 'moral judgment' that the unlawful conduct warrants such an award to punish the wrongdoer and deter others." *Kyle v. Patterson*, 196 F.3d 695, 697 (7th Cir. 1999) (quoting *Merriweather v. Family Dollar Stores of Ind.*, 103 F.3d 576, 582 (7th Cir. 1996)). Accordingly, the Court will allow the finder of fact to make a determination regarding the propriety of punitive damages.

As a final matter, the Court notes that it granted Swanigan leave to file an Amended Complaint on three occasions as the case proceeded through discovery. Swanigan filed his Third Amended Complaint approximately one month before the end of fact discovery, meaning that Swanigan had the benefit of a nearly fully-developed factual record before filing his Third Amended Complaint. Despite having the opportunity to narrow his claims based on the information he obtained during the course of discovery, Swanigan named each individual officer as a defendant in each count. Although Swanigan moved to voluntarily dismiss some officers from the action after they moved for summary judgment, he made absolutely no effort to narrow the scope of his remaining claims. For example, even though the undisputed facts reveal that only four defendant officers were actually present at the scene of Swanigan's arrest, he brought a false arrest claim against twenty officers, many of whom had no contact with Swanigan until he had already been in police custody for hours. The Court notes that because Swanigan refused to narrow the scope of his claims even after conducting discovery and filing one Complaint and Three Amended Complaints, he forced the Court to waste time and divert its judicial resources to sifting through many frivolous claims in the hopes of discovering a few potentially meritorious claims. Swanigan is reminded that "[j]udges are not like pigs, hunting for truffles buried in" the record. *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991); *see also Albrechtsen v. Bd. of Regents of Univ. of Wisc. Sys.*, 309 F.3d 433, 436 (7th Cir. 2002) ("Courts are entitled to assistance from counsel . . . .").

## CONCLUSION AND ORDER

For the reasons stated, Swanigan's claims against Kavanaugh, Orsa, Rogus, Switalla Uginchus and Beazley are dismissed with prejudice. Defendants' Motion for Summary Judgment is granted in part and denied in part. Defendants' Motion for Summary Judgment is granted in its

entirety except for Swanigan's claim against Frazier in Count II. Swanigan's Motion for Summary Judgment is granted in part and denied in part. With respect to Count I, Swanigan's Motion for Summary Judgment is denied. With respect to Count II, Swanigan's Motion for Summary Judgment is granted as to Lynch, Mullane, Guajardo and Porebski. Swanigan's claims in Count II will proceed to trial for a determination of liability as to Woitowich, Anderson, Dillon and Frazier. Swanigan's claims against Lynch, Mullane, Guajardo and Porebski will proceed to trial on the issue of damages.

So ordered.

_____
Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date:   August 4, 2009