**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **RASHAD B. SWANIGAN,** | ) |
| | ) **Case No.  07 C 4749** |
| **Plaintiff,** | ) |
| **v.** | ) **Judge Virginia M. Kendall** |
| | ) |
| **ROBERT TROTTER, et al.,** | ) **Magistrate Judge Sidney I. Schenkier** |
| | ) |
| **Defendants.** | ) |

**PLAINTIFF'S PETITION AND MEMORANDUM IN SUPPORT OF PETITION FOR**
**ATTORNEY'S FEES AND NONTAXABLE COSTS**

Plaintiff, Rashad B. Swanigan, by and through his attorneys, Irene K. Dymkar and

James L. Bowers, hereby petitions this Court for an order granting attorney's fees and

nontaxable costs and submits the following memorandum in support of said petition.

**Introduction**

On August 4, 2009,  the Court granted summary judgment on liability to plaintiff,

Rashad B. Swanigan, against defendants Detective Michael F. Lynch, Detective Kevin T.

Mullane, Detective Sergeant Max J. Guarjardo, and Watch Commander Lieutenant Joseph J.

Porebski on plaintiff's unlawful detention claim.

A trial commenced on August 22, 2011, on the issue of liability and damages against

defendants Officer Robert Trotter, Officer Thomas Muehlfelder, and Sgt. William Kaupert on

the false arrest claim, and against Watch Commander William N. Woitowych, Watch

Commander Janice Dillon, Watch Commander Kevin Anderson, and Detective Michael Frazier

on the illegal detention claim, and on the issue of damages only against Detective Lynch,

Detective Mullane, Detective Sergeant Guarjardo and Watch Commander Lieutenant Porebski

on the illegal detention claim.

Defendant Detective Max Guarjardo failed to appear at trial, with no excuse.  After seven

days, the trial concluded on August 30, 2011, with a jury verdict of damages in favor of plaintiff

against defendants Detective Lynch, Detective Mullane, Detective Sergeant Guarjardo and

Watch Commander Lieutenant Porebski, as well as a jury verdict of liability and damages

against Watch Commander William N. Woitowych, Watch Commander Janice Dillon, and

Watch Commander Kevin Anderson, on the unlawful detention claim. The jury found for

defendants Officer Trotter, Officer Muehlfelder, and Sergeant Kaupert on the false arrest claim,

and for defendant Detective Frazier on the unlawful detention claim. The jury awarded plaintiff

$60,000 in compensatory damages.[1]

As the prevailing party, plaintiff is entitled to attorney's fees. On September 20, 2011,

plaintiff submitted detailed time and work records which were kept by counsel

contemporaneously with the expenditure of time, in intervals of 1/10's of an hour. Plaintiff also

submitted counsel's proposed hourly rates, along with the material plaintiff said he would use to

support the hourly rates. The submissions were in compliance with the 21-day rule set forth in

Local Rule 54.3(d)(4).

Defendants ignored plaintiff's submissions. Pursuant to local rule, defendants were to

provide their own time and work records (Local Rule 54.3(d)(5)(A)), and "*any evidence the

respondent will use to oppose the requested hours, rates, or related nontaxable expenses*"

(emphasis added) (Local Rule 54.3(d)(5)(D). Defendants failed to provide their time and work

records or any evidence they intended to use to oppose the requested hours or rates. The

deadline for the submission was October 11, 2011. On October 19, 2011, plaintiff's counsel

wrote to defense counsel to coax them into submitting any objections and providing any

evidence supporting any of their objections. Defendants did not respond to the letter.

On October 20, 2010, defendants moved for a stay of the determination of attorney's fees

until the attorney's fees issue in two other unrelated cases was determined. *Document 317.*

---

[1] The minute order at Document 311, the judgment at Document 312, and the jury verdict at
Document 314 are inconsistent in their reporting of the verdict and none of them correctly reports the
verdict. Plaintiff's counsel mentioned this to defense counsel and anticipated that defense counsel would
move to correct the judgment to protect their clients; they have not done so. Plaintiff will obtain a
transcript of the declaration of the verdict or move to obtain a copy of the verdict sheet, which is
restricted, in order to correct the judgment.

No explanation was given as to why defendants had not submitted their objections or in any other way participated in the mandatory pre-petition procedure for negotiating attorneys' fees before plaintiff is allowed to file a petition. As a result of defendants' motion, the Court allowed defendants until December 30, 2011, a total of 101 days from when plaintiff's counsel first submitted their time and work records and proposed rates, to present defendants' objections.

Defendants submitted their objections to plaintiff for the first time on December 29, 2011, which were incorporated in the Joint Statement attached hereto as Exhibit 1. Pursuant to Local Rule 54.3(f), the argument and evidentiary matter in defendants' opposing memorandum should now be limited to the specific issues that were listed as disputed in the Joint Statement.

Plaintiff's lodestar for two attorneys and a paralegal is $841,765.68, as set forth in the Joint Statement attached as Exhibit 1 and supported in this memorandum. Plaintiff asks that the full lodestar be awarded.

### Facts of the Case

Rashad Swanigan was a union carpenter apprentice who worked at high-end buildings such as Harpo Studios and high-rises on Lake Shore Drive and was thriving in his profession. He had no criminal record. His father, Isaiah Swanigan, was a police officer who had retired from the Chicago Police Department after working for 30+ years. His mother, Dorsey Swanigan, was a school teacher with the Chicago Public Schools.

Plaintiff's mother and father, as well as his fiancee, Laura Baines, described Rashad as an artistic and extremely sensitive person. He was accomplished in art, dance, and playing musical instruments. He had won dance competitions and his art had been exhibited at shows.

On August 22, 2006, Rashad went to Labe Bank at North Elston and North Pulaski in Chicago, Illinois, to cash a check. When he returned to his car in the parking lot, he was accosted by two police officers, Robert Trotter and Thomas Muehlfelder, who accused him of trying to rob the Labe Bank. The Labe Bank had not been robbed. Officers Trotter and Muehlfelder had a very general description of someone who had robbed banks on the Chicago's

north side in the recent past; the height, weight, age, and race of the robber were similar to Rashad's height, weight, age, and race, but also similar to that of tens of thousands of other African-American young men in Chicago.

Without permission, the officers searched Rashad's car, finding his carpenters' tools and equipment, including several hardhats and sharp blades and tools. The officers also claim they saw in plain view a small fruit knife that Rashad used to cut fruit; Rashad is a vegetarian.

In consultation with Sgt.William Kaupert, who appeared on the scene, Officers Trotter and Muehlfelder decided to arrest Rashad to investigate him as a bank robber. In order to do so, they decided to charge him with traffic violations on the car parked in the parking lot, for which there was no proof. They also decided to charge him with a City ordinance violation for possession of the fruit knife. Defendants towed his car from the parking lot.

Once at the station, Officers Trotter and Muehlfelder contacted Detectives Michael Lynch and Kevin Mullane. A "hold" was placed on Rashad, which resulted in Rashad never being taken before a magistrate during his incarceration. Rashad was interrogated about the robberies. Because Lynch and Mullane had to defer to the Federal Bureau of Investigation for the investigation of a bank robbery, they proceeded to investigate Rashad for a robbery at the Popeye's Chicken restaurant instead. Detective Michael Frazier, who worked with the F.B.I., investigated the bank robberies.

Rashad was ridiculed and degraded while in custody. Twice he was denied access to a toilet and forced to urinate on himself, only to be called a "dirty dog." Rashad was intimidated by the hardened criminals he met when incarcerated. He was held at the police station and not taken to the Cook County Jail during his entire incarceration. They did not have bedding or regular meals at the police station. Rashad was given a concrete slab to sleep on.

Rashad became distraught and disoriented. Rashad was placed in several line-ups, including line-ups for drug selling, guns, and car theft events, which were not documented in his police records. He was told that he was picked out of a line-up for the Popeye's Chicken

robbery. Rashad became delusional. He testified that at one point he thought that because everyone said he was a robber, maybe he was one.

Detective Sergeant Guarjardo had approved the "hold" request on Rashad the first night and so did Watch Commander Lieutenant Porebski. On subsequent days, on various shifts, Watch Commander William N. Woitowych, Watch Commander Janice Dillon, and Watch Commander Kevin Anderson failed to inquire as to why Rashad was still being held at the police station and inexplicably failed to release him.

Only after 48 hours had passed, an Assistant State's Attorney, Emily Stevens, was called for felony review. After talking to the witnesses from the Popeye's Chicken robbery, who recanted the stories that the police said they had been told, she declined to press charges. Rashad was released 51-53 hours after he was arrested, a broken man.

After his release, Rashad's life began to spiral out of control. He could no longer go to work as a carpenter because he was afraid of being re-arrested. He became a recluse, staying at home rather then being with people. He gave up dancing and art. A month after his false detention, Rashad took a large sum of money from his closet that he had been saving from his wages to buy a house, and left the house to go buy a car. He himself then became the victim of an armed and violent robbery; when he sought help from the police, the detectives started questioning him about the Popeye's Chicken robbery. The F.B.I. contacted him through Detective Fraser to continue investigating him for bank robberies. Rashad's life fell apart. Because of his distraction, when he tried to drive, Rashad crashed and totaled his car. Because he could not pay rent to his mother, she lost her home to foreclosure.

It became clear that Rashad was an "eggshell skull" plaintiff, someone who was so profoundly affected by the mistreatment and false allegations of the police that it destroyed his sense of self-worth and his ability to function at work and in society. Plaintiff's counsel retained a psychiatrist, Dr. Lambros Chrones, who testified proficiently and persuasively at deposition and trial that Rashad suffered from significant symptoms of anxiety and depression consistent

with a diagnosis of Adjustment Disorder with Mixed Anxiety and Depressed Mood, Chronic.
This psychiatric condition resulted in plaintiff having unsurmountable difficulties in returning to
work as a carpenter, or resuming other normal activities, as a result of being arrested as "the
Hard Hat Bandit."

This legal was labor-intensive. Plaintiff's counsel vigorously litigated the substantive
legal issues, which were convoluted and required much briefing. After working on the case *five
years*, drafting a complaint and three amended complaints, taking or participating in over twenty
depositions, bringing numerous discovery motions, filing a successful motion for partial
summary judgment and defending against defendants' motion for summary judgment,
participating in expert disclosure and discovery, attending five extensive pre-trial conferences,
preparing the case for trial three times, drafting and re-drafting the jury instructions numerous
times, bringing numerous substantive motions to reconsider, motions *in limine* and motions to
bar, and trying (unsuccessfully) to engage defense counsel in settlement negotiations *even up to
the date of trial*, plaintiff has documented and claims a lodestar of $809,658.00.

## I. Legal Standard For Adjudicating Plaintiff's Fee Petition

Given the favorable jury verdict, plaintiff's attorneys, solo practitioner Irene K. Dymkar
and solo practitioner James L. Bowers, are entitled to attorneys' fees as the prevailing party
under 42 U.S.C. § 1988. *Riverside v. Rivera*, 477 U.S. 561, 578 (1986) (fee awards are designed
"to encourage the bringing of meritorious claims which might otherwise be abandoned because
of the financial imperatives surrounding the hiring of competent counsel"). Under familiar
lodestar principles, the amount of the fee award is calculated by multiplying reasonable hours
times hourly rate. *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).

The lodestar is presumptively an appropriate measure of the fee award. *Blum v. Stenson*,
465 U.S. 886, 897 (1984). As the Supreme Court has clarified, this "strong presumption that the
lodestar figure. . . represents a reasonable fee is wholly consistent with the rationale behind
[§1988]." *Blanchard v. Bergeron*, 489 U.S. 87, 95 (1989).

In this case, plaintiff's lodestar is justified, and should be granted for the reasons discussed below.

## II. Plaintiff Was Forced to Trial Because Defendants Categorically Refused to Engage in Meaningful Settlement Negotiations

On July 23, 2009, then Chicago Police Superintendent Jody P. Weis wrote Northern District of Illinois Chief Judge James F. Holderman a letter indicating a "no settlement" policy on cases against Chicago police officers he deemed "frivolous." A copy of the letter is attached as Exhibit 2.[2] The "tail wagging the dog" result of this letter and its pronouncement was that the Corporation Counsel's Office instituted a "no settlement" policy for the majority of their cases. This was contrary to the Northern District of Illinois Standing Order Establishing Pretrial Procedure (adopted pursuant to General Order of 26 June 1985; amended pursuant to General Orders of 27 November 1991 and 9 March 1995), which directs all counsel and their parties "to undertake a good faith effort to settle a case that includes a thorough exploration of the prospects of settlement."

The present case was caught up in the new "no settlement" policy net. On March 21, 2008, the City made an offer of judgment on behalf of the defendants who were in the case at the time for $20,001.00 plus attorneys' fees and costs accrued to the date of the offer, which both sides agree made the offer in its entirety worth about $40,000.00. *Exhibit 3.* The City remained rigid and uncompromising, and would not negotiate any higher figure, even after losing plaintiff's summary judgment motion on August 4, 2009.

Early in the case and frequently throughout the case, the Court inquired as to whether a settlement was possible. Several times during the pendency of this action, plaintiff's counsel

---

[2] The ethical problems with this letter abound. By plaintiff's counsel's review of court PACER system when this letter was written, Weis was a defendant in 16 pending cases. In addition, hundreds of his employee officers were also defendants in pending cases. This was thus an *ex parte* communication by a litigant to the Chief Judge, bypassing his attorney, the Corporation Counsel. By mentioning officers who have died in the line of duty, Weis' intention in writing the letter was to elicit sympathy; this was also inappropriate. The comment in the final paragraph, "I look forward to your support in this matter and would like to discuss it further should you desire to do so," is beyond reproach.

approached defense counsel, asking them to consider settlement, but the City attorneys could not be persuaded to budge. Plaintiff's counsel warned defense counsel repeatedly that the number of hours expended in this case was high and urged them to consider a settlement of all claims.

The history of settlement negotiations is as follows:

> April 23, 2008 - Plaintiff wrote an extensive demand letter, asking for $100,000.00, plus attorney's fees and costs. By telephone, plaintiff changed the demand to $100,000.00, *including* attorney's fees and costs. This offer was withdrawn on June 9, 2008.

> August 18, 2008 - Before expert disclosure, plaintiff wrote an extensive demand letter, asking for $200,000.00, plus attorney's fees and costs.

> August 25, 2008 - Defendants offered $30,000.00 in a letter. *Exhibit 4.*

> August 28, 2008 - A settlement conference held with Magistrate Judge Sidney I. Schenkier and the City would not move in their offer.

> January 19, 2009 - Plaintiff wrote a letter asking the City to consider a settlement figure at $100,000.00, so as not to require City Council approval. *Exhibit 4.*

> January 23, 2009 - Defendants repeated their $30,000.00 offer. *Exhibit 4.*

> August 4, 2011 - Just days before trial, plaintiff sent a final demand letter, demanding $175,000.00, including attorney's fees and costs, which represented what plaintiff and his counsel knew was a huge discount of the fees and costs, in order to avoid the risk that always exists of losing at trial. *Exhibit 4.*

> August 10, 2011 - Deputy Corporation Counsel Liza Franklin stated in an e-mail that she had no authority, but "could make a pitch to the Corporation Counsel" for the offer of judgment amount of $40,000.00. *Exhibit 4.*

Whether defendants were willing to engage in reasonable settlement negotiations is a factor for the Court to consider in a fees petition. *Heder v. City of Two Rivers,* 255 F.Supp.2d 947, 956 (E.D.Wis.2003) (awarding full lodestar because plaintiff offered to settle on reasonable terms; court concluded: "the City has only itself to blame for the disproportionality between the attorneys' fees incurred and the amount Heder recovered . . . and [plaintiffs should not] be forced to swallow expenses incurred largely as a result of the City's approach to this litigation."); *Gonzalez v. Van's Chevrolet, Inc.,* 498 F.Supp. 1102, 1106 (D.Del.1980) ("Confronted as he was with defendant's adamant position, petitioner was required to try this case to the hilt. This

necessitated a two and a half day trial . . . The objection which defendant makes to the payment of any fee in excess of the lodestar is in this sense self-inflicted because of defendant's refusal to make any [reasonable] offer in settlement of this case.").

Defendants obviously had the right to demand trial and force plaintiff to litigate every issue to the bitter end.  But, by having imposed that cost on plaintiff and the legal system, defendants must bear the result of their failed strategy.

### III.  Plaintiff's Counsel Should Be Fully Compensated for Successfully Proving a Constitutional Violation in a Case They Were Forced to Take to Trial

The  purpose for awarding attorney's fees under 42 U.S.C. § 1988 is to provide an incentive for competent and skilled attorneys to take on unpopular cases and indigent clients, thereby acting as a "private attorney general." *Farrar v. Hobby,* 506 U.S. 103, 113 S.Ct. 566, 578 (1992) (O'Connor, J. concurring) ("[I]t is a tool that ensures the vindication of important rights, even when large sums of money are not at stake, by making attorney's fees available under a private attorney general theory."); see *City of Riverside v. Rivera*, 477 U.S. 561, 578, 106 S.Ct. 2686, 2696, 91 L.Ed.2d 466 (1986) (citing *Kerr v. Quinn*, 692 F.2d 875, 877 (2d Cir. 1982)); *Newman v. Piggie Park Enters*., 390 U.S. 400, 402, 88 S.Ct. 964, 966 (1968). As the Court stated in *Newman*, when a plaintiff brings a civil rights claim, "he does so not only for himself but also as a 'private attorney general,' vindicating a policy that Congress considered of the highest priority." *Newman*, 390 U.S. at 402, 88 S.Ct. at 966;  *see Dunning v. Simmons Airlines, Inc.,*  62 F.3d 863, 873 n.13 (7th Cir.1995); *see also Hensley v. Eckerhart,* 461 U.S. 424, 444, n.4, 103 S.Ct. 1933, 1945, n.4 (1983) (Brennan, J. concurring) (recognizing that Congress determined that "the public as a whole has an interest in the vindication of the rights conferred by the statutes enumerated in § 1988, above and over the value of a civil rights remedy to a particular plaintiff."); *Kerr v. Quinn,* 692 F.2d 875, 877 (2nd Cir.1982) ("The function of an award of attorneys' fees is to encourage the bringing of meritorious civil rights claims which might otherwise be abandoned because of the financial imperatives surrounding the hiring of competent counsel.")

Where, as here, plaintiff obtained an overall victory on liability, he is entitled to the reasonable lodestar. *See Jaffee v. Redmond*, 142 F.3d 409, 414 (7th Cir. 1998) ("If a plaintiff ultimately wins on a particular claim, she is entitled to all attorney's fees reasonably expended in pursuing that claim."). The Seventh Circuit continues to subscribe to this view. *Gautreaux v. Chicago Housing Auth.*, 491 F.3d 649, 661-62 (7th Cir. 2007) ("So long as the plaintiffs' lawyers' activities are factually related to issues on which the plaintiffs have achieved [success] and the work was reasonably calculated to result in relief, the district court may grant attorneys' fees"); *see also Buffington v. Baltimore County*, 913 F.2d 113, 128 n.12 (4th Cir.1990) ("Section 1988 rewards a plaintiff who ultimately prevails--who wins the war--without deducting for lost battles along the way.").

In the case at hand, the jury's verdict is far from inconsequential. The jury found against four Watch Commanders, two Detectives, and a Supervising Detective. The jury awarded plaintiff $60,000.00 in damages. In addition, there was a significant societal benefit for plaintiff having brought his lawsuit against errant Chicago police officers, especially ones with rank.

### IV.  The Hours Spent In This Case Were Reasonable And Should Be Approved

Plaintiff's attorney Irene Dymkar claims 1037.4 hours of time expended in this case. Plaintiff's attorney James L. Bowers claims 584.2 hours of time expended in this case. Plaintiff's attorney's paralegal, Chantelle Hill, claims 51.6. hours expended in this case. *Exhibits 1, 5 - 7.*

Defendants assert that the reasonable number of hours for attorney Dymkar is 942 hours and the reasonable number of hours for attorney Bowers is 547 hours. Thus, defendants assert a reduction of 95.4 hours for attorney Dymkar and 37.2 hours for attorney Bowers. However, the arithmetic in defense counsel's breakdown of hours and objections is not correct and is not reconcilable.[3]  Defendants do not contest any of the paralegal hours. *Exhibit 1.*

---

[3] In the joint statement, defendants contest a total of 117.6 hours for attorney Dymkar and 37.2 hours for attorney Bowers. The contested hours for deposition attendance (37.2 hours) appears to be subtracted twice, partially from attorney Dymkar (22.2 hours) and totally from attorney Bowers (37.2 hours). The figures on defense counsel's various charts, not prepared on a spreadsheet, cannot be reconciled.

**A.  Plaintiff's attorneys' method for keeping track of time was reasonable and defense counsel's refusal to produce time and work records deprives the Court of meaningful comparison**

Attached as Exhibit 5 are the time and work records for plaintiff's attorney, solo practitioner Irene K. Dymkar, totaling 1037.4 hours through August 30, 2011, not including negotiation, research, and preparation time for the bill of costs and this fee petition.  Attached as Exhibit 6 are the time and work records for plaintiff's other attorney, solo practitioner James L. Bowers, totaling 584.2 hours.  Attached as Exhibit 7 are the time and work records for paralegal Chantelle Hill, totaling 51.6 hours.

Plaintiff's attorneys' practice is to keep track of time spent on legal work contemporaneously with the work performed.  Thus, these timesheets are not reconstructions of what the time might have been for the work performed; it is the actual time.  It is also the practice of plaintiff's attorneys to keep track of time spent on legal work in 1/10's of an hour, that is, in 6-minute increments, even though it appears to be the standard practice in this community for attorneys to keep track of time in 1/4 hours.  The practice of using 1/10-hour increments enhances the accuracy of the time reporting and eliminates the "rounding-up" that inevitably occurs when the lowest increment of time is 1/4 hour, or 15 minutes.   Many tasks can be performed within the time period of 6 minutes, or 12 minutes, or 18 minutes.

The Corporation Counsel's Office contends that it is not able to account for the time their attorneys spent on this case.  However, it must be noted that when City attorneys want to reconstruct their time, such as when *they* are requesting attorneys' fees, somehow they are able to do so.  Attached as Exhibit 8 is the fees petition filed by City attorneys *against* Irene K. Dymkar's firm in the case of *Hadnott v. Kelly,* 07 C 6754, as well as attorney affidavits and timesheets (07 C 6754, Document 249).  Attached as Exhibit 9 is part of the fees petition filed by City attorneys in *Heard v. City of Chicago,* 10 C 1050, with timesheets (10 C 1050, Documents 26, 27).  Attached as Exhibit 10 is part of the fees petition filed by City attorneys in *Thayer v. Chiczewski,* 07 C 1290, with timesheets (07 C 1290, Document 495).

The Court has been deprived of meaningful comparison because of the City's refusal to reconstruct their time. Given this asymmetry of information, it is unfair for the City to try to pick holes in the reasonableness of plaintiff's totals. *Cooper v. Casey,* 897 F.Supp. 1136, 1139-40 (N.D.Ill.1995) ("[I]t is unpersuasive for defendants to cavil at plaintiffs' division of labor as purportedly overlapping and inefficient, when defendants' own expenditure of time cannot be evaluated for comparative purposes because they do not account for their time . . ."); *Mostly Memories, Inc. v. For Your Ease Only, Inc.,* 594 F.Supp.2d 931, 934 (N.D.Ill.2009) ("As an initial matter, the Court notes that Mostly Memories failed to disclose information pertaining to its own fees incurred in this litigation as required by Local Rule 54.3(d)(5), and so it is on weak footing when arguing in the abstract that the hours spent by FYEO's attorneys were excessive."); *Farfaras v. Citizens Bank and Trust of Chicago*, 433 F.3d 558, 569 (7th Cir.2006) ("Defendants' counsel claimed before the district court that its billing records were irrelevant. This position is inconsistent with the letter and spirit of Local Rule 54.3. The rule's purpose is *to avoid the type of hypocritical objections presented by the defendants.*") (emphasis added).

### B. Defendants' reduction of all 46.9 hours for attorney/client conferences from October 19, 2007, until August 11, 2011, is not reasonable

Defendants object to all of plaintiff's time and work records for attorney/client conferences from the filing of the original complaint through trial preparation on August 11, 2011. *Exhibit 1, Joint Statement 4(c).* This includes time for preparing interrogatories, preparing three times for trial, and informing plaintiff of the various changes in court decisions in this case.

First, it must be noted that defense counsel complains about plaintiff's counsel spending 46.9 hours over 4 years talking to her client. This computes to an average of 11.7 hours a year, certainly not an excessive amount of time.

Second, defendants are aware that Rashad Swanigan was an emotionally fragile, high maintenance client. The trauma from the false arrest and detention seeped into all aspects of his

12

life and made representing him often a challenge for plaintiff's attorney. When telephoning Rashad, counsel would have to wait for someone she could hear in the background knock on his bedroom door, where he spent most of every day, to convince him to come out to speak on the telephone. Plaintiff's counsel asked Rashad to be present at several police depositions, in order to help determine which officer committed which offenses. However, the situation was stressful and on two occasions, plaintiff walked out of the room and waited in the bathroom until the completion of the deposition. On one occasion, Rashad was so distraught that he sat in the client waiting room after the deposition for two hours, trying to gain his composure. Before trial, Rashad was brought into the courtroom several times, in order to make him feel comfortable with being in public and in the court environment. During the trial, much effort was expended in keeping plaintiff from bolting out of the courtroom because of the stress.

Plaintiff was determined to vindicate himself by proceeding to trial, but his mental health condition was a clear impediment. Fortunately, the retained psychiatrist gave some perspective to plaintiff's condition. Nevertheless, plaintiff's disabilities consumed counsel's time and that time is compensable.

Third, it is unreasonable for defendants to seek to eliminate all attorney/client contact time in a four-year period that included preparing for trial three times. Defendants claim that the time was "unnecessary," but that is clearly wrong. Plaintiff had the right to consult with his attorney as needed. Defendants say the billing records are "ambiguous." However, further detail is not required; Local Rule 54.3(d)(1) states that "[time and work] records may be redacted to prevent disclosure of material protected by the attorney-client privilege or work product doctrine." Plaintiff asks the Court to consider the Criminal Justice Act fee voucher attached as Exhibit 11, which indicates that the comparable category accepted by the federal court for court-appointed criminal counsel, that is, "interviews and conferences," is even more general than plaintiff's entries.

13

**C.  Defendants' reduction of 16.5 hours for drafting documents such as subpoenas, Freedom of Information Act requests, and reviewing and organizing the trial files is not reasonable**

Defendants object to plaintiff's time and work records for drafting documents such as subpoenas, Freedom of Information Act requests, and reviewing and organizing the trial files. *Exhibit 1, Joint Statement 4(d).*  However, this was work actually performed by an attorney.  It must be noted that the many hours of paralegal work that went into drafting *routine* notices, subpoenas, and documents are not being claimed.  However, this case became so convoluted and complicated, that certain documents had to be drafted by an attorney because the wording of the documents was critical.

This case consists of *16 5-inch paper files,* full of documents.  While the many hours that went into the basic organization of the files were expended by a paralegal and are not claimed, the decision of which exhibits would be presented to the jury and the organization of which of the voluminous number of documents were going to travel to court and the decision of how they were going to be organized was an *attorney* decision and an integral part of trial preparation. Although she provided much assistance, plaintiff's paralegal was not qualified to prepare the case for trial.

Plaintiff asks the Court to consider that the Criminal Justice Act fee voucher attached as Exhibit 11 indicates that the comparable categories accepted by the federal court for court-appointed criminal counsel, such as "obtaining and reviewing records" and "investigative and other work," are even more general than plaintiff's entries.

**D.  Defendants' reduction of 9.2 hours for drafting notices of motion is not reasonable**

Defendants object to plaintiff's time and work records drafting notices of motions. *Exhibit 1, Joint Statement 4(e).*  However, the notices of motions were actually and necessarily drafted by an attorney because of the trial judge's (Judge Virginia Kendall's) unique requirements.  Judge Kendall has a three-day notice rule; however, she counts the days

14

differently than most judges and her requirements are posted on her website. Also, unlike other judges, the Judge's days off the bench do not appear on the e-filing system, but rather appear instead on her website. In addition, at the time these motions were filed, Judge Kendall had a very strict courtesy copy requirement, which has recently been eliminated from the Court's website. If counsel's recollection is correct, there was a requirement that the courtesy copy be served before 4:30 PM on a given day, in order not to lose the count of that day towards the notice requirement. If the motion was filed in the evening, there was a strict requirement that the courtesy copy had to be delivered to chambers by a certain time (believed to be 11:30 AM) the next morning. If the courtesy copy rules were not followed, the motion would be stricken. When scheduling a motion, therefore, it was important to have the ability to deliver the courtesy copy in a timely fashion in order not to lose the motion date.

Having run afoul of the Court's specific and unique rules in other cases, plaintiff's attorney decided to draft the notices herself in this case, always checking the Court's website for any special instructions or changes in the Court's unique requirements.

## E. Defendants' reduction of 4.3 hours for contact with the attorneys representing Assistant State's Attorney Emily Stevens is not reasonable

Defendants object to 4.3 hours in plaintiff's time and work records for telephone contact over a two-year period (July 28, 2008, through June 4, 2010) with the attorneys representing Assistant State's Attorney Emily Stevens. *Exhibit 1, Joint Statement 4(f)*. However, this was work actually and necessarily performed by an attorney. In fact, it was difficult for *an attorney* to secure the cooperation of the State's Attorney's Office in this case because of its reluctance to be involved in this case. Also, the attorney representing Ms. Stevens kept changing; at one point it was attorney John Ouska, at other points it was attorney Patrick Driscoll and, on one occasion, it was attorney Mark Struppa.

Emily Stevens was an important witness in this case because it was her review of the case after more than 48 hours had passed that led to plaintiff's release from custody. However, this

case lasted so long that Ms. Stevens gave birth to two children during the pendency of this action. We had to maneuver around two due dates and two maternity leaves. This required much negotiation, since Ms. Stevens at one point had to be reached at her home to prepare an affidavit.

Plaintiff subpoenaed the State's Attorney's file in this case and subpoenaed Ms. Stevens for deposition. At Ms. Stevens' deposition, it was discovered that she had made hand-written notes that had not been disclosed. Through some negotiation, plaintiff was able to obtain the notes and an affidavit regarding the significance of those notes. For plaintiff's summary judgment motion, another affidavit was obtained. Ms. Stevens was also subpoenaed for trial all three times the case was scheduled for trial.

Every contact with the State's Attorney's Office involved a struggle. There is no way this work could have been done by a paralegal.

**F. Defendants' reduction of 37.2 hours for appearances of both plaintiff's attorneys at some depositions is not reasonable**

Defendants object to both plaintiff's attorneys' presence at some depositions and seek for some unknown reason to reduce *both* attorney Dymkar's hours and attorney Bowers' hours by the 37.5 hours of deposition time. *Exhibit 1, Joint Statement 4(g).* Defendants suggest that plaintiff overstaffed the case, yet defendants usually had *two or three of their attorneys* present at the deposition, usually including Liza M. Franklin, the Deputy Corporation Counsel, clearly one of the highest paid attorneys in the Corporation Counsel's Office. Attached as Exhibit 12 is the deposition list with attorneys in attendance listed.

The case was obviously worthy of resources from the defense perspective, and plaintiff should not be held to a different standard. *Lenard v. Argento,* 808 F.2d 1242, 1245 (7th Cir. 1987) ("Defendants should not have wasted our time with. . .complaining that Lenard was represented by three lawyers. The defendants were also represented by three lawyers. . ."); *Garcia v. City of Chicago*, No. 01 C 8945, 2003 WL 22175620, at *5 n.10 (N.D. Ill. Sept. 19,

16

2003) ("The City cannot seriously argue that [plaintiff's counsel] overstaffed this case, in light of its own staffing. The City had several attorneys in the corporation counsel office and three outside law firms working on this case. Moreover, the City, like plaintiff, had three trial counsel."); *Cooper v. Casey,* 897 F.Supp. 1136, 1139 (N.D.Ill.1995) ("It is worth noting once again that this dispute was not treated as a one-lawyer suit by defendants either-they took a team approach to the litigation."). See *Gautreaux v. Chicago Housing Authority*, 491 F.3d 649 661 (7th Cir.2007). ( "There is no hard-and-fast rule as to how many lawyers can be at a meeting or how many hours lawyers can spend discussing a project." Multiple lawyers, working together, may lead to more efficiency and reduced costs. *Id.*).

### G. Defendants' reduction of 3.8 hours for work on defendants' motion to consolidate the *Monell* claim is not reasonable

Defendants object to 3.8 hours of attorney time preparing for and attending a motion hearing and drafting a response to defendants' motion to consolidate the *Monell* claim with the present case. *Exhibit 1, Joint Statement 4(h).*

Defendants forget the history of this case. Plaintiff moved to amend the complaint in this action when it became apparent from the discovery obtained that there was a strong *Monell* claim against the City of Chicago. *Document 86.* Defendants opposed this motion, and the Court held that since the *Monell* claim would delay a trial of this matter, there would be no amendment. *Document 88.* Plaintiff thereafter filed a second action for the *Monell* claim, entitled *Swanigan v. City of Chicago,* 08 C 4780. In a 180-degree reversal, defendants then moved to consolidate the two actions. By that point, however, three more months had passed and plaintiff did not want to lose his April 27, 2009, trial date in the present action, so he opposed the motion to consolidate the two actions. *Document 116.*

The motion to consolidate was brought in the 07 C 4749 action and plaintiff's response was reasonable. Ultimately, the Court ordered that the *Monell* claim case should be re-assigned to her, but on the motion of defendants, stayed any proceedings in the *Monell* action, thus treating the second action as "a related action," not a consolidated action. *Document 125.*

On January 4, 2012, the Court, *sua sponte,* dismissed the *Monell* claim on the pleadings. *Swanigan v. City of Chicago,* 08 C 4780 (Document 24). Plaintiff will be appealing this ruling.

The time expended for the motion hearing and drafting the response opposing the consolidation, which at that time would have delayed a trial of the present matter, was reasonable.

### V. Plaintiff's Counsels' Hourly Rates Are Reasonable And Should Be Approved

Irene K. Dymkar and James L. Bowers, each with 34 years of trial experience, seek as their rate $495.00/hour (or $514.80/hour, which is the Laffey Matrix rate adjusted for the locality differential). Plaintiff seeks $135/hour for the paralegal time. Chantelle Hill is a fully trained, certified, and experienced paralegal, with a Master's Degree in Criminal Justice from Lewis University and a Paralegal Certification from Roosevelt University. As discussed below, all of the proposed rates are reasonable and supported, and should be approved.

### A. Plaintiff's request is consistent with the prevailing market rates

The purpose and intent of §1988 is to attract talented lawyers to civil rights endeavors. By promising to award the prevailing hourly rates, lawyers who could otherwise command high billing rates in commercial pursuits are encouraged to represent clients such as plaintiff. *See Casey v. City of Cabool, Mo.*, 12 F.3d 799, 805 (8th Cir.1993) ("In order for such a policy [vindicating civil rights through private action] to be effective, Congress felt it appropriate to shift the true full cost of enforcement to the guilty parties to eliminate any obstacle to enforcement."), citing S. Rep. No. 1011, 94th Cong., 2d Sess. 5 (1976), reprinted in 1976 U.S.C.C.A.N. 5908, 5913) ("It is intended that the amount of fees awarded under [§ 1988] be governed by the same standards which prevail in other types of equally complex Federal litigation, such as antitrust cases. . .").

An attorney's reasonable hourly rate is determined based on the market rate for the attorney's services, which is the rate charged by lawyers of similar ability and experience in the community. *Spegon v. Catholic Bishop of Chicago,* 175 F.3d 544, 555 (7th Cir.1999) Rates

comparable to those from the private sector are routinely approved in civil rights litigation. *See,
e.g., O'Sullivan v. City of Chicago*, 484 F.Supp.2d 829, 838 (N.D.Ill. 2007) (relying on 2006
*National Law Journal* sample showing, e.g., that fourth-year associates at large firms bill up to
$325 or $330/hour in 2006). In *Entertainment Software Ass'n v. Blagojevich*, 05 C 4265,
2006 WL 3694851 (N.D. Ill. Aug. 9, 2006), the Court approved rates at the following levels:
1979 law graduate (27 years of practice): $585/hour; 1996 law graduate (10 years of practice):
$425/hour; 2000 law graduate (6 years of practice): $340/hour. *Id.* at *2 -*3.

Plaintiff has attached affidavits from attorneys who concentrate in the practice of
plaintiffs' civil rights law in Chicago, Illinois. All affidavits support the requested rate of
$495/hour (or the enhanced rate of $514.80) for plaintiff's attorneys, Irene K. Dymkar and
James L. Bowers, each of whom has been practicing 34 years, as a reasonable rate for this
market. Affidavits from the following Chicago civil rights attorneys are attached:

> 1) Kenneth F. Flaxman of Kenneth F. Flaxman, P.C., a 1972 law graduate
> practicing law for 39 years, charges $650/hour and states that $500/hour is a
> reasonable rate for attorneys with the experience of Dymkar and Bowers.
> *Exhibit 13*.
>
> 2) Jon Loevy of Loevy & Loevy, a 1993 law graduate practicing law for 18
> years, has been awarded $425/hour by the Court multiple times. His father,
> Arthur Loevy of his firm, with experience comparable to attorneys Dymkar and
> Bowers, has been awarded $475/hour by the Court multiple times. He states that
> $495/hour is a reasonable rate for attorneys Dymkar and Bowers. *Exhibit 14.*
>
> 3) Janine H. L. Hoft of Peoples Law Office, a 1984 law graduate practicing law
> for 27 years, relates that in *Delgado v. Mak*, 2009 U.S. Dist. LEXIS 6287, the
> Court awarded members of her firm the following rates: $525/hour for a 1972 law
> graduate with 37 years of practice (G. Flint Taylor), $400/hour for a 1979 law
> graduate with 30 years of practice (John Stainthorp), and $325/hour for a 1997
> law graduate with12 years of practice (Joey Mogul). She states that an hourly
> rate of $500/hour is a reasonable rate for attorneys with the experience of Dymkar
> and Bowers. *Exhibit 15*.
>
> 4) Edward M. Fox of Ed Fox & Associates, a 1986 law graduate practicing law
> for 25 years, has a billing rate in contingency cases of $450/hour and charges
> clients on retainer $400/hour. *Exhibit 16.*
>
> 5) Jon Erickson of Erickson & Oppenheimer, admitted to practice in 1990 and
> practicing with Michael Oppenheimer, also admitted to practice in 1990, thus
> both practicing law for 21 years, have a billing rate of $450/hour, as evidenced by

Plaintiff's attorneys prevailed at trial, vindicating the violation of plaintiff's constitutional rights the attached retainer agreement. *Exhibit 17*.

6)  David A. Cerda, a 1990 law graduate practicing law for 21 years, was recently awarded $425/hour in the case of *Thompson v. City of Chicago,* 2011 WL 2837589*5 (N.D. Ill. Feb. 14, 2011), which was affirmed by the district court at 2011 WL 2923694, at *4 (N.D. Ill. July 18, 2011).  He is appealing the decision, seeking a rate of $475/hour.  *Exhibit 18.*

7)  Amanda Antholt of Smith, Johnson, & Antholt, LLC, a 2002 law graduate practicing for 9 years, has a billing rate of $350/hour.  She lists relevant fee awards she is aware of and, based on that, states that an hourly rate of $500/hour is a reasonable rate for attorneys with the experience of Dymkar and Bowers. *Exhibit 19.*

8)  Matthew C. Robison of Barrido & Robison, a 2006 law graduate practicing for 5 years with experience at 3 civil rights law firms, states that an hourly rate of $500/hour is a reasonable rate for attorneys with the experience of Dymkar and Bowers. *Exhibit 20.*

The affidavit of attorney Jeffrey J. Neslund, attached as Exhibit 21, indicates that an attorney fee award is often several times higher than the jury award to the plaintiff.

**B. Defendants are bound by the doctrine of judicial estoppel with regard to the City's prior position regarding the Laffey Matrix**

The United States Attorney's Office for the District of Columbia has created what has become known as the Laffey Matrix to provide an official guideline for "reasonable" rates in fee-shifting cases.  *Adcock-Ladd v. Secretary of Treasury*, 227 F.3d 343, 347 n.3 (6th Cir. 2000) (describing Laffey Matrix as "an official statement of market-supported reasonable attorney fee rates").  According to the United States Attorney: "The matrix is intended to be used in cases in which a 'fee-shifting' statute permits the prevailing party to recover 'reasonable' attorney's fees.'" *http://www.usdoj.gov/usao/dc/Divisions/Civil_Division/ Laffey_Matrix_8.html*. (see Explanatory Note), a copy of which is attached as Exhibit 22.  The matrix provides the following rate guidelines:

| Experience | 2008-2009 | 2009-2010 | 2010-2011 | 2011-2012 |
|---|---|---|---|---|
| **20+ years** | 465/hour | 465/hour | 475/hour | 495/hour |
| **11-19 years** | 410/hour | 410/hour | 420/hour | 435/hour |

| Paralegals and Law Clerks | 130/hour | 130/hour | 135/hour | 140/hour |
|---|---|---|---|---|

The Laffey Matrix "is a concession by that office [the United States Attorney] of what it will deem reasonable when a fee-shifting statute applies and its opponent prevails and seeks attorney fees." *Adolph Coors Co. v. Truck Ins. Exch.*, 383 F.Supp.2d 93, 98 (D.D.C. 2005). *See also Chanel, Inc. v. Doan*, 2007 WL 781976, *6 (N.D.Cal. March 13, 2007) (court's practice to rely on the Laffey Matrix as reliable official data to determine appropriate hourly rates); *Kormer v. Astrue*, 2009 WL 3152039 at *2 n.5 (D.Minn. Sept. 24, 2009); *White v. McKinley*, 2009 WL 813372 at *7 (W.D.Mo. March 26, 2009).[4]

The Laffey Matrix as adjusted for the locality differential would dictate rates for Irene Dymkar and James Bowers at $495/hour + 4%, or $514.80/hour, using 2011-2012 figures. Paralegal rates are $140/hour using 2011-2012 figures. Plaintiff's counsel's proposed rates are thus directly in line with the Laffey Matrix presumptions, and should thus be approved as reasonable.

Several district courts within the Seventh Circuit, including this one, have favorably considered the Laffey Matrix. *Berg v. Culhane,* 2011 WL 589631, *3 (N.D.Ill.,Feb.10, 2011) (Kendall, J.); *Hadnott v. City of Chicago*, 2010 WL 1499473, *6 (N.D.Ill. April 12, 2010) (Schenkier, J., affirmed by Coar, J.), citing *In re Trans Union Corp. Privacy Litig.*, 2009 WL 4799954, at *19 (N.D.Ill. Dec. 9, 2009); *Catalan v. RBC Mortgage Co.*, 2009 WL 2986122, at

---

[4] Courts outside of Washington D.C. typically adjust the Laffey Matrix for what is called the "locality pay differential." *See Chanel, Inc.,* 2007 WL 781976, at *6-*7 (adopting the Laffey Matrix rate, but adjusting them upward by 5% due to the locality pay differential between California and D.C.); *In re HPL Technologies, Inc. Securities Litig.*, 366 F. Supp. 2d 912, 921 (N.D. Cal. 2005) (adjusting the Laffey Matrix upward by 9% over the Laffey Matrix figures give the pay differential for San Francisco). The locality pay differential in Chicago is 19.70% versus 15.98% for the D.C. area, meriting a 4% increase over the Laffey figures. *See* data located on the United States' Office of Personnel Management webpage at *http://www.opm.gov/oca/05tables/indexGS.asp.* ; *Schultz v. City of Burbank,* No. 06 C 5646, 2007 WL 1099479 at *2 (N.D.Ill. Apr.10, 2007) (Soat Brown, M.J.) (adding 4% to the figure provided by the Laffey Matrix); *Berg v. Culhane,* 2011 WL 589631, *3 (N.D.Ill., Feb.10, 2011) (Kendall, J.) (citing adjustments upward with approval).

*6 (N.D.Ill. Sept. 16, 2009); *Decker v. Transworld Sys., Inc.*, 2009 WL 2916819, at *5 (N.D.Ill. Sept. 1, 2009); *Robinson v. City of Harvey*, 2008 WL 4534158, at *7 (N.D.Ill. Oct. 7, 2008); *Lopez v. City of Chicago*, 2007 WL 4162805, at *8 (N.D.Ill. Nov. 20, 2007); *Delgado v. Village of Rosemont*, 2006 WL 3147695, at *5 (N.D. Ill. Oct 31, 2006); *Sadler v. Barnhart*, 2004 WL 419908, at *2-3 (N.D.Ill. Feb. 25, 2004). *See also Arch v. Glendale Nissan*, 2005 WL 1421140, *1 (N.D. Ill. June 7, 2005); *Covington-McIntosh v. Mount Glenwood Mem. Gardens S., Inc.*, 2004 WL 2700482, *4 (N.D. Ill. Feb. 12, 2004); *Embry v. Barnhart*, 2003 WL 22478769, *2 (N.D. Ill. 2003).

Of special significance here, the City of Chicago itself has relied upon and, in fact, embraced the Laffey Matrix in cases in which *the City* has sought attorneys' fees. Because of this, it should be estopped from arguing that the matrix is irrelevant to the Court's consideration of attorney rates. The City of Chicago *and two of the defense attorneys in this case* (Ashley C. Kosztya and Megan McGrath) successfully used the Laffey Matrix *against Irene Dymkar* in the case of *Hadnott v. City of Chicago*, 2010 WL 1499473, *6 (N.D.Ill. April 12, 2010). In that case, the City's motion from August 2008 (attached hereto as Exhibit 8) mentions "consulting the Laffey Matrix," and each City attorney (Gail L. Reich, Ashley C. Kosztya, and Megan K. McGrath) in her declaration based her request on the Laffey Matrix:

> Ashley C. Kosztya, who graduated from John Marshall Law School 7 years earlier, was admitted to the federal trial bar for 5 years, and listed herself as trial counsel in only 1 jury trial, which took place *after* the work on *Hadnott* in August 2008, requested $300/hour and was awarded $270/hour.

> Gail Reich, who graduated from John Marshall Law School 6 years earlier, was admitted to the federal trial bar for 1 year, and was trial counsel in only 1 previous jury trial, requested and was awarded $270/hour.

> Megan K. McGrath, who graduated from Loyola University School of Law 2 years earlier, requested $225/hour and did not receive an award.

The Court (Schenkier, J., affirmed by Coar, J.) relied heavily on the Laffey Matrix in its decision to set the fees for the City attorneys. *Hadnott v. City of Chicago*, 2010 WL 1499473, *7 (N.D.Ill.

22

April 12, 2010) ("We conclude that the Laffey Matrix is 'satisfactory evidence' of the prevailing rate, so that the burden shifts to opposing counsel to show why a 'lower rate is essential'").

Another case in which the City relied upon the Laffey Matrix was *Heard v. City of Chicago,* 10 C 1050 (attorney affidavit attached at Exhibit 9).

Defendants are bound by the doctrine of judicial estoppel with regard to the City's prior position regarding the Laffey Matrix. See *New Hampshire v. Maine,* 532 U.S. 742 (2001) ("Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position," quoting *Davis v. Wakelee*, 156 U.S. 680, 689 (1895)). 532 U.S. at 749. Although "probably not reducible to any general formulation of principle," courts generally consider several factors in determining whether the doctrine of judicial estoppel applies to a case:

> First, a party's later position must be 'clearly inconsistent' with its earlier position.
>
> Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create 'the perception that either the first or the second court was misled.'
>
> A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

532 U.S. at 750-51, internal citations omitted).

Defense counsel, who are some of the same City attorneys as those in the *Hadnott* case, who used the Laffey Matrix as a sword against Irene Dymkar as plaintiffs' attorney in the *Hadnott* case, should be judicially estopped from arguing against the Laffey Matrix in this case.

### C. Given their 34 years of trial experience, plaintiff's counsel should be awarded rates at the upper range of reasonable

#### 1. Irene K. Dymkar

Irene Dymkar's declaration in support of this petition is attached hereto as Exhibit 23. She has been a practicing trial attorney for more than 34 years, with a diverse and varied practice

in New York State and in Illinois. She has been involved in criminal prosecution and criminal defense, and in civil plaintiff's work. She has practiced widely in federal court and state court, as well as in appellate courts at all levels. Currently, her practice is focused exclusively in the area of civil rights litigation, specifically police misconduct cases.

Since working exclusively on police misconduct cases, Ms. Dymkar has maintained a consistent caseload of approximately 30 - 40 cases, most of which are filed or will be filed in the Northern District of Illinois. She has settled dozens of cases, many against the City of Chicago. Attorney James L. Bowers and she recently settled a jail death case for $1,000,000. Mr. Bowers and she have won three of the recent cases that have proceeded to a jury trial in federal court (*Blackwell v. Kalinowski, et al.,* 08 C 7257, *Ragland v. Ortiz, et al.,* 08 C 6157, and *Swanigan v. Trotter, et al.,* 07 C 4749). A fourth one (*Hadnott v. City of Chicago*, 07 C 6754) resulted in a hung jury; the Court accepted a partial verdict over objection, but has allowed briefing on the propriety of that decision before proceeding to a second trial. Ms. Dymkar currently has four police misconduct appeals pending before the Seventh Circuit and will be filing two additional notices of appeal, one of which is for the case related to the case at hand, *Swanigan v. City of Chicago*, 08 C 4780. Ms. Dymkar previously argued a First Amendment case before the Seventh Circuit in 2006 and sought review by the United States Supreme Court, which was denied.

Ms. Dymkar has not had her hourly rate set by the Court due to the fact that until recently the vast majority of the federal civil rights cases she handled were resolved by settlement. Although she works on contingency, she still maintains strict time records for each case she handles. The computable hourly rate for cases she has settled has varied. It has been as high as $1,000/hour and is often in the $500/hour range.

In 2010, in the case of *Nelson v. Lis,* 09 C 883, in the Northern District of Illinois, the Court awarded Ms. Dymkar attorneys' fees as a sanction against the City of Chicago. The City attorneys agreed to pay for six hours of attorney time. Their initial offer was $1,950.00, six

24

hours at the rate of $325/hour. The final agreement was a payment of $2,500.00, which computes to an hourly rate of $416.67. The letters confirming this agreement are attached to the fees petition as Exhibit 24.

## 2. James L. Bowers

James Bowers' affidavit in support of this petition is attached hereto as Exhibit 25. He has also been a practicing trial attorney for more than 34 years, with a diverse and varied practice in Illinois. He has worked as General Counsel for Clipper Exxpress doing civil antitrust work and as a trial attorney for the United States Department of Labor, responsible for prosecuting violations of the Occupational Safety and Health Act of 1970 throughout the Midwest Region. He was a trial attorney with Rosin & Rosin, concentrating in medical malpractice, product liability, and significant personal injury litigation. From 1988 to 1998, he was a principal and partner in the law firm of Bowers & Palmer, concentrating in the litigation of medical malpractice and personal injury cases. During that period, he was also a regular lecturer at the Occupational Safety and Health Training Institute on the subject of asbestos enforcement policy and litigation. From 1999 to present, he has been a solo practitioner, concentrating in medical malpractice, personal injury, civil rights, and OSHA defense.

Since 2006, Mr. Bowers has worked as co-counsel with Irene Dymkar in § 1983 cases involving police misconduct, false arrest, excessive force, jail death, and municipal liability. In the past year and a half, he has tried eleven cases to verdict with Ms. Dymkar in the Northern District of Illinois. He recently settled a jail death case for $1,000,000. He has won three civil rights cases since May 2011.

## D. The rate of $495/hour (or $514.80/hour, the Laffey Matrix rate adjusted for the locality differential) is reasonable and should be approved

Irene Dymkar and James Bowers both seek the rate of $495/hour (or $514.80/hour, the Laffey Matrix rate adjusted for the locality differential), which is substantially below the rate

they would earn under the *Entertainment Software* private sector scale referenced above. In *Entertainment Software Ass'n v. Blagojevich*, 05 C 4265, 2006 WL 3694851 (N.D. Ill. Aug. 9, 2006), the Court approved the rate of $585/hour for a 1979 law graduate with 27 years of experience. The rate requested is consistent with the market rate in Chicago as established by the attorney affidavits set forth as Exhibits 13 - 21. The rate requested is also in line with the presumption called for under the Laffey Matrix.

The requested rate is also in line with other awards in civil rights cases. On January 12, 2012, in *Smith v. City of Chicago,* 09 C 4754 (Document 226, 229), the Court set the rate at $425/hour for 1989 law graduate Blake Horwitz. On July 29, 2011, in *Carrel v. Sisk,* 09 C 844 (Document 111, 113), the Court set the rate at $475/hour for 1981 law graduate Gregory Kulis. In *Dunn v. Chicago*, Northern District of Illinois, No. 04 C 6804, the blended rate for the Loevy & Loevy partners was established at $450/hour in November 2010. In *Delgado v. Mak*, 2009 U.S. Dist. LEXIS 6287), in 2008, the Court set the rate of $525/hour for 1972 law graduate G. Flint Taylor and $400/hour for 1979 law graduate John Stainthorp. In February 2011, the Court set the rate at $425/hour for 1990 law graduate David A. Cerda in *Thompson v. City of Chicago*, 07 C 1130, 2011 WL 2837589, at *5 (N.D.Ill. Feb. 14, 2011), a recommendation that was adopted by the district court, reported at 2011 WL 2923694, at *4 (N.D. Ill. July 18, 2011), a judgment which plaintiff has taken up on appeal.

The requested rate is also in line with other awards in other civil cases:

    1) $645/hour for attorney with 22 years of experience. *Carr v. Tillery*, 2010 WL 1416007, *7 (S.D.Ill. March 31, 2010).

    2) $560/hour for 1998 graduate with 12 years of experience, $450/hour for attorney with 6 years of experience *Neuros Co., Ltd. v. KTurbo Inc.,* 2010 WL 547599 (N.D.Ill. Feb. 9, 2010).

    3) $465/hour for 1991 graduate with 18 years of experience. *Jones v. Ameriquest Mortg. Co.*, 2009 WL 631617, *4 (N.D.Ill. March 10, 2009).

    4) $415/hour for attorney with 21 years of experience. *Loudermilk v. Best Pallet Co., LLC*, 2009 WL 4350651, *2 (N.D.Ill. Nov. 25, 2009).

26

5) $400/hour for 1993 graduate with 16 years of experience. *Catalan v. RBC Mortg. Co.*, 2009 WL 2986122, *6 n.8 (N.D.Ill. Sept. 16, 2009).

6) $394/hour for 1994 graduate with 15 years of experience. *Decker v. Transworld Sys., Inc.*, 2009 WL 2916819, *5 -*6 (N.D.Ill. Sept. 1, 2009).

### E. The paralegal rate of $135/hour is reasonable

Plaintiff's attorney's fees awards encompass the work of paralegals. *See Richlin Sec. Service Co. v. Chertoff*, 53 U.S. 571 (2008) ("Attorney's fee," as used in the Civil Rights Attorney's Fees Awards Act embraces paralegal fees). Of significance, in the Joint Statement, defendants do not contest the number of paralegal hours. Nevertheless, defendants argue that the paralegal rate of $135/hour is not reasonable.

Plaintiff attaches the declaration of Chantelle Hill as Exhibit 26, which indicates that Ms. Hill has a Bachelors of Arts in Criminal Justice and a Masters of Science in Criminal Justice, in addition to a Paralegal Certificate. She has been working as a litigation paralegal for six years. She is well-qualified and her work merits the rate of $135/hour, less than the Laffey Matrix of $140/hour.

Plaintiff notes that during the entire trial, defendants had *three attorneys* representing them, Liza Franklin, who, as noted above, is the Deputy Corporation Counsel and clearly one of the highest paid attorneys in the Corporation Counsel's Office, Ashley Kosztya, and Megan McGrath. As mentioned above in the context of the deposition staffing, this case was obviously worthy of the resources for three attorneys from the defense perspective, and plaintiff should not be held to a different standard. See *Lenard v. Argento,* 808 F.2d 1242, 1245 (7th Cir. 1987); *Garcia v. City of Chicago,* No. 01 C 8945, 2003 WL 22175620, at *5 n.10 (N.D. Ill. Sept. 19, 2003); *Cooper v. Casey,* 897 F.Supp. 1136, 1139 (N.D.Ill.1995).

Paralegal Chantelle Hill's services in preparing the exhibits and the exhibit books, keeping plaintiff calm, preparing the parties and witnesses for testimony, assuring the smooth flow of witnesses and testimony, and coordinating the publishing and display of exhibits on the Court's projection equipment, was invaluable. She was the extra eyes and ears that helped the

trial run smoothly, and in order to avoid the distraction of the two attorneys and to avoid having to have a third attorney in the courtroom, it was essential that Ms. Hill be present for the trial. Her engagement at trial and absence from the office was a reasonable expense which plaintiff's attorney incurred.

Plaintiff notes that this illustrates the problem with defendants refusing to give or reconstruct time and work records. If the Court had the time and work records, it would know how many attorneys and paralegals at the defense law firm actually participated in defending this case and the number of hours they devoted to that defense. *Cooper v. Casey,* 897 F.Supp. 1136, 1139-40 (N.D.Ill.1995) ("[I]t is unpersuasive for defendants to cavil at plaintiffs' division of labor as purportedly overlapping and inefficient, when defendants' own expenditure of time cannot be evaluated for comparative purposes because they do not account for their time . . ."); *Farfaras v. Citizens Bank and Trust of Chicago*, 433 F.3d 558, 569 (7th Cir.2006) ("Defendants' counsel claimed before the district court that its billing records were irrelevant. This position is inconsistent with the letter and spirit of Local Rule 54.3. The rule's purpose is *to avoid the type of hypocritical objections presented by the defendants.*") (emphasis added).

The Laffey Matrix suggests $140/hour as a reasonable paralegal rate. *Exhibit 22.* See *Carr v. Tillery*, 2010 WL 1416007, *7 (S.D.Ill. March 31, 2010) (paralegal billing approved at $130/hour). The requested rate of $135/hour is reasonable and should be approved.

### F. Defendants' proposed retained defense attorney rate of $225/hour is unsupported and irrelevant and should be summarily rejected by the Court

Defendants claim in the Joint Statement that plaintiff's attorney rate is "not in line with what other attorneys of similar experience in the area of civil rights litigation earn per hour (as demonstrated by the rates the City pays outside counsel for civil rights cases)." *Exhibit 1, p 3.* The assertion that $225/hour is the guaranteed rate the City pays defense attorneys on contract, however, is unsupported by anything other than the hearsay statement of trial counsel.

More important, the guaranteed rate the City of Chicago alleges it pays retained defense counsel on contract is not relevant to the determination of plaintiff's attorney fees and should be

summarily rejected by the Court. See *Gautreaux v. Chicago Housing Authority,* 491 F.3d 649, 660 (7th Cir.2007) ("[A]lthough the CHA [Chicago Housing Authority] wants us to accept evidence of the fees it pays attorneys to demonstrate that a lower rate should be awarded, it has offered no convincing argument why the district court was obliged to use the City's pricing structure as a proxy for what the market will bear."); *KL v. Edgar,* 2000 U.S. Dist. LEXIS 15404 *26-27 (N.D.Ill.2000, 92 C 5722) ("Not surprisingly, defendants cite no authority to support the notion that plaintiffs' fee award must be based on defense counsel's billing rate because such an arrangement would frustrate the purpose of Section 1988 . . . In short, reasonableness, not defense counsel's compensation, dictates the rates plaintiffs' counsel may recover under Section 1988."); *Metropolitan Sanitary Dist. of Greater Chicago ex rel. O'Keefe v. Ingram Corp.,* 85 Ill.2d 458, 482 (1981) (When "the client is a public entity . . . [it] customarily pays less than the going rate for privately retained counsel.").

## VI. Defendants' Proposed Reduction of the Lodestar by 50% Is Unsupported and Should Be Summarily Rejected by the Court

Defendants claim in the Joint Statement that the lodestar should be reduced by 50% because of plaintiff's "lack of success on his total claims." *Exhibit 1, p 3.* This assertion is unsupported.

The law does not permit any arbitrary reduction in the lodestar. *Jaffee v. Redmond*, 142 F.3d 409, 413 (7th Cir. 1998) ("*Hensley* makes clear that when claims are interrelated, as is often the case in civil rights litigation, time spent pursuing an unsuccessful claim may be compensable if it also contributed to the success of other claims"); *Calderon v. Witvoet*, 112 F.3d 275, 276 (7th Cir. 1997) (disapproving of a "meat-axe approach" to reducing lodestar fees, and stating that "[p]ercentage reductions of the kind the district court used are not a good way to make adjustments for partial success").

Defendants have not defined what they mean by "lack of success" and they have not supported their assertion with evidence or case law. The proposed reduction should be summarily rejected by the Court.

29

**Conclusion**

Unlike some attorneys -- including the defense attorneys in this case -- who receive remuneration win or lose, plaintiff civil rights attorneys frequently expend substantial time and out-of-pocket capital on cases without any compensation for their efforts. Truth be told, all too often, undersigned counsel have devoted substantial sums of money and time in worthwhile cases in the past, only to receive nothing at all for those efforts. Where, as here, however, the client does prevail, counsel deserves compensation commensurate with the risk, the amount of work required and time expended, and the degree of success. This is particularly the case when the client's very success is due in large measure to the time-consuming efforts on the part of his attorneys on his behalf resulting from recalcitrance on the part of defense counsel to settle this case without the necessity of proceeding to trial.

WHEREFORE, plaintiff, Rashad Swanigan, respectfully requests that the Court grant his attorney'' fees petition and award in full the fees and costs based on the lodestar presented by plaintiff in the Joint Statement attached hereto as Exhibit 1, that is, $841,765.68.

Dated: January 17, 2012                          /s/      Irene K. Dymkar
                                                        Irene K. Dymkar

Attorneys for Plaintiff:

Irene K. Dymkar
300 W. Adams Street, Suite 330
Chicago, IL 60606-5107
(312) 345-0123

James L. Bowers
631 N. Central
Chicago, IL 60644-1507
(773) 379-9262

30

**CERTIFICATE OF SERVICE**

I, Irene K. Dymkar, an attorney, hereby certify that on January 17, 2012, I served a copy of this petition on the attorneys for defendants below through the Court's electronic filing system:

Liza M. Franklin
Ashley Kosztya
Megan McGrath
City of Chicago, Department of Law
30 N. LaSalle, Suite 900
Chicago, IL 60602

Dated: January 17, 2012                                    /s/     Irene K. Dymkar
                                                                        Irene K. Dymkar

31